STATE OF NEBRASKA, APPELLEE, V.
WILMA L. CASTOR, APPELLANT.
599 N.W. 2d 201

Filed August 27, 1999. Nos. S-98-509, S-98-510.

574

James R. Mowbray and Jerry L. Soucie, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

In these consolidated cases, Wilma L. Castor appeals from judgments of conviction on seven separate felony counts and one misdemeanor count. Case No. S-98-510 includes Castor's appeal from her convictions on one count of first degree murder, three counts of forgery, one count of use of a deadly weapon to commit a felony, one count of being a felon in possession of a

firearm, and one count of unauthorized use of a financial transaction device. In case No. S-98-509, Castor appeals from her conviction on an additional count of forgery. In case No. S-98-509, we reverse, and remand for a new trial. In case No. S-98-510, we affirm in part, and in part reverse and remand to the district court for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

*Introduction.*

At approximately 6 p.m. on December 10, 1996, Tom Brown was found dead at the bottom of a roadside ditch in rural Buffalo County, northwest of Kearney, Nebraska. The body was dressed in jeans over blue sweatpants, a yellow pullover shirt, and gray socks. The victim was situated on his back, partially under a barbed wire fence, with his right arm extended over his head, which was lower than his legs because of the slope of the ditch. Dried blood extended from his nose to the lateral corner of his right eye. Brown's shirt was pulled up and twisted, and his jeans and sweatpants were pulled down. There were no shoes or coat on the body. Brown's glasses and several spots of blood were found near the edge of the ditch.

Dr. Jerry Jones performed an autopsy and determined that Brown died as the result of three .22-caliber gunshot wounds, one in the right side of the neck and two in the chest. Jones was unable to state a precise opinion as to the time of Brown's death, but testified that it could have been as early as Thanksgiving Day, which fell on November 28, 1996. Jones opined that based upon the absence of lividity in the body, Brown did not die at the site where his body was found, but, rather, died elsewhere and was subsequently moved. Dr. Robert Bux, a pathologist who testified on behalf of Castor, stated that in his opinion Brown was killed at the site where his body was found and his death could have occurred up to 3 days after Thanksgiving Day.

*Relationship Between Castor and Brown.*

Castor and Brown were married in 1967 and had two surviving sons, Tom Brown, Jr., and Edward Brown (Eddy). They divorced in 1975 but remained in periodic contact. Both remarried several times. Brown's last marriage was to Diane Guider,

who died in 1993. At the time of her marriage to Brown, Diane Guider had three sons and one daughter by prior marriages: Terry Anderson, Troy Guider, Todd Guider, and Tracy Person.

Following the dissolution of her marriage to Brown, Castor had two marriages which also ended in dissolution. She and Eddy eventually moved to Reno, Nevada, where they lived together. After military service, Tom Brown, Jr., resided in Kearney. He was incarcerated in Lincoln at the time of his father's death.

Castor and Eddy moved from Reno to Nebraska in 1996. Beginning in approximately July of that year, Castor lived with Brown at his home in Kearney, ostensibly for the purpose of assisting him with the repair and maintenance of his home. Castor slept in a second-floor bedroom, and Brown usually slept on the sofa in the living room on the first floor of the home. Brown's stepson Todd Guider was also living with Brown from about May to October 1996, and he occupied another second-floor bedroom. Eddy stayed at Brown's home in Kearney during 1996 except for periods when he was visiting his girl friend, who resided in Oregon.

*Burglary Report.*

On October 9, 1996, Castor notified the Kearney Police Department that Brown's home, where she then resided, had been burglarized. A police officer who responded to the report was unable to find signs of a forced entry. He observed that the screens in the two upstairs bedrooms where Todd Guider and Castor stayed had approximately 12-by-12 cutouts and that Castor's bedroom had been ransacked. Castor informed the responding officer that her short-barreled, .22-caliber revolver and an unknown quantity of change had been stolen from her bedroom. Castor informed the officer that she thought perhaps Todd Guider committed the burglary because on October 8, a young woman had stopped at the house and told her that Todd Guider owed money for drugs. Castor also told the officer that she had been receiving unusual telephone calls. The officer did not take any physical evidence into custody, did not take fingerprints, did not take any photographs, and did not otherwise examine the crime scene. He told Castor to tell Todd Guider that

he wanted to talk to him but made no other attempt to contact or interview Todd Guider. Later in the day, Castor reported the serial number of her missing handgun to the police. The Kearney Police Department closed the burglary investigation that same day.

*Events of Thanksgiving Week 1996.*

Brown had been a railroad worker for approximately 28 years prior to his death. During 1996, he normally worked away from home at a jobsite from Sunday afternoon until Thursday evening. During the week of Thanksgiving 1996, however, Brown was at home on vacation.

On Tuesday, November 26, 1996, shortly after 5 p.m., Diane Hixon of Phillips 66 in Bartlesville, Oklahoma, called Brown's residence to inquire about a past-due account. She testified at trial that the party answering the telephone identified himself as "Tom Brown" and denied having a Phillips 66 credit card. Janet Whaley, a credit analyst with Phillips 66, then made another call to Brown's residence and, at the request of a party identified as "Tom Brown," closed the account. Phillips 66's records showed that the account address when opened on September 17, 1996, was 512 West 21st Street in Kearney, which was the address of Brown's home. On September 30, the address was changed at the request of a telephone caller to a Kearney post office box utilized by Castor. On November 29, check No. 2639 was written on Brown's account to Phillips 66 for $194.08.

During a telephone conversation on November 26, 1996, Brown invited his nephew Todd Michalski and his family to have Thanksgiving dinner at his home. Michalski accepted, but circumstances prevented him from traveling from his home in Roscoe, Nebraska, to Kearney on Thanksgiving Day. Thus, the only people present at Brown's home on Thanksgiving Day were Brown, Castor, and Eddy. Eddy testified that when he went to bed that evening, Brown and Castor were watching television.

Eddy testified that when he awoke early the next morning, Castor was already awake and that he did not look for Brown. Castor and Eddy then went to a restaurant for breakfast. Castor stated that when they returned, Brown was awake and suggested that they all go Christmas shopping, which she thought to be

unusual because Brown disliked shopping. According to Castor, the three then embarked upon a shopping trip.

At 8:31 a.m. on November 29, 1996, Brown's Visa check card was used to purchase a child's comforter, tights, cigarettes, and a gasoline additive at a store in Kearney. At 9:21 a.m. on the same day, the card was used to purchase a dropcloth, toys, jeans, and a hinge hasp at another Kearney store. Later, at 11:09 a.m., the card was used to purchase insulin, toothpaste, and hand soap at a third store in Kearney. In a videotaped statement given to police on December 15, Castor said that Brown was present and authorized all the Visa transactions, although she actually signed his name. The record includes surveillance videotapes from one of the three stores, which do not positively identify the person making the purchases or those present when the purchases were made.

At 10:38 a.m. on November 29, 1996, Castor and Eddy deposited two $2,000 checks which had been written on Brown's account into their joint checking account at a Kearney bank and withdrew $300 in cash, for a net deposit of $3,700. In her statement, Castor represented that on the night before Thanksgiving Day, Brown instructed her to write the checks to herself and Eddy as gifts.

Castor stated that after the shopping trip and the visit to the bank, she, Eddy, and Brown returned to Brown's house. She stated that while she was unloading the car, she heard Brown say "I'll be a son of a bitch," and then observed him walk toward a pickup which was parked on the street in front of his house. She did not pay much attention to what he was doing, but heard him say he was going to work on the truck. She saw only the rear and side of the truck and described it as "brown with primer on it." Castor stated that after Brown got into the truck, she never saw him again. Eddy and Castor installed the hinge hasp, purchased earlier that day, on the basement door sometime that afternoon.

Angela Lauby testified that Castor was present at Kearney Keno, where they both worked, before 3 p.m. and again around 6 p.m. before Castor's shift began on November 29, 1996. Lauby testified that she and Castor were friends and that Castor had told her she hated Brown. Lauby recalled Castor telling her that Brown did not know about the Phillips 66 card. Lauby tes-

tified that on the same day Castor told her about the credit card, Castor also showed her Brown's checking account, which reflected a balance of more than $10,000, and said she was angry because he "cut her off" despite the money in his account. According to Lauby, Castor and Brown did not have an intimate relationship, and Castor was frantic when her gun, which she referred to as "her baby," was stolen.

On the night of November 29, 1996, Castor and Lauby had conversations with their shift supervisor Brian Sazama about switching shifts for the next night, but Castor changed her mind. Castor punched in for work that evening at about 6:50. Sometime after 6 p.m., Michalski arrived unexpectedly at Kearney Keno and told Castor that he had gone to Brown's house but found no one home. Michalski testified that when Castor asked him where he was staying, he replied that he and his family intended to get a motel room in Kearney. Castor told him she would pay half of the room charge, and did so. Castor told police she did not want Michalski to stay at Brown's house because Brown had previously instructed her never to permit anyone to stay there when he was not at home.

When Castor departed from Kearney Keno at 11:30 p.m., prior to the end of her normal shift, she left a note for the manager, Becky Crocker, stating that November 29, 1996, was her last day of work and leaving an address where her final paycheck could be forwarded. Castor had previously given notice that her last day would be December 6. Castor told police that after leaving work, she and Eddy went home and put several loads of her personal items in storage, finishing about 3 a.m. on November 30. Castor paid for this storage unit with a check written on Brown's account to which she signed Brown's name. According to Castor, she and Eddy then drove to Grand Island and stayed at a motel there because she needed to pay off four insufficient funds checks at a store located in Grand Island later that morning. After doing so, they returned to Brown's house in Kearney. Michalski and his wife arrived, and he helped Castor and Eddy load the rest of their belongings into their vehicle. Castor and Eddy then left Kearney around noon, driving to North Platte where they checked in to a motel room for the night. Castor and Eddy then drove on to Oregon. After staying for a

short time, Castor flew to Reno, returning several days later to retrieve her vehicle.

*Police Investigation.*

After the discovery of Brown's body, officers from the Kearney Police Department and the Buffalo County Sheriff's Department forced open the back door of Brown's house and entered without a warrant. After they walked through the house and determined that no one was present, one officer stayed at the residence and the others departed. Officers returned with warrants on December 11, 14, and 16, 1996, and conducted searches of the residence. On December 16, the police changed the locks on the house and seized the residence.

On or about December 18, 1996, Officer Steve Jensen of the Buffalo County Sheriff's Department observed a cleaned area on the wall behind the sofa and on half of the baseboard. Neither Jensen nor anyone else photographed this area or removed the baseboard for further examination. At trial, Jensen testified about his observations over Castor's objection.

On or about February 27, 1997, law enforcement authorities released the house to Tom Brown, Jr., who by then had been discharged from prison, without a specific authorization from the court that had issued the search warrants. Capt. Robert Winquest of the Kearney Police Department, who directed that the house be released, stated he had earlier discussed the decision to release the house with the county attorney. On June 10, Castor's attorneys went to the residence, where they were met by Officer Michael Young of the Kearney Police Department. At that time, the sofa was no longer present because Tom Brown, Jr., had given it to Todd Guider. The furniture had been moved, and the house was more disheveled than it had been on December 10, 1996. After viewing photographs provided by the State of the house and its contents, Castor stated that there were a number of items which had been in the house but had not been collected as evidence and thus were not available to the defense, including a billfold on an upstairs dresser belonging to Todd Guider, a newspaper article regarding a Nick Vasquez and Castor's stolen gun, a ledger showing who owed Brown money, and a telephone book belonging to Brown.

*Castor's Arrest and Trial.*

Castor and Eddy returned to Nebraska together to attend Brown's funeral on December 15, 1996. They were met by the police at the Grand Island airport and questioned, and it was at this time that Castor gave the videotaped statement which was subsequently received in evidence at her trial. Soon thereafter, Castor was arrested and charged with the offenses of which she was eventually convicted. While incarcerated in the Dawson County jail awaiting trial, Castor told a cellmate that Brown had a $25,000 life insurance policy naming Castor as a beneficiary and Castor had wondered aloud if she would be able to collect the proceeds of the policy. Other evidence established that Brown had an $18,000 life insurance policy which named Castor as the primary beneficiary.

A jury trial was held on all counts except the felon in possession count which was bifurcated for a separate bench trial. The State contended that Castor killed Brown on November 28, 1996, by shooting him three times while he was sleeping on either a sofa or a recliner in his home, and then hid his body in the basement of the house. The State also contended that Castor forged the two $2,000 checks on Brown's checking account and used his check card to make the purchases at the three Kearney stores before eventually transporting his body to the remote rural location where it was found. The jury returned verdicts of guilty on all charges. A subsequent bench trial on the bifurcated felon in possession charge also resulted in a conviction.

*Posttrial Motions and Sentencing.*

Following entry of judgment, Castor filed a timely motion for new trial in case No. S-98-510, which was subsequently amended. The grounds for a new trial asserted by Castor included misconduct by the prosecuting attorney, consisting of his alleged failure to disclose certain exculpatory information to the defense in response to discovery requests and orders entered prior to trial. This information included an incident report prepared by the Kearney Police Department on December 23, 1996, 13 days after the discovery of Brown's body. The report summarizes an interview of Bruce Peterson conducted by Kearney police officers during the investigation of the Brown homicide.

Peterson resided in rural Buffalo County, Nebraska, approximately 5 miles from where Brown's body was discovered. The report, written by Officer Young, states:

> Investigator Jensen and I interviewed Peterson at the Law Enforcement Center. He said that he lives on Evergreen Road in Buffalo County and that on either 11/29/96 or 11/30/96, between 5:00-6:00 p.m., he and his son were outside walking and heard three gun shots in a row. He said the shots were crystal clear and seemed to come from a north easterly direction. He did not think it sounded like a shotgun but was more like some kind of handgun. He thought this was odd as they were fired in rapid succession and it was getting dark outside.

Castor's counsel filed an affidavit stating that he was not made aware of this report or its substance until February 18, 1998, more than 2 months after Castor's trial, despite the fact that prior to trial, he advised the prosecutor that Bux would testify that in his opinion, Brown was killed at the spot where his body was found.

Castor's allegations of prosecutorial misconduct were also based in part upon a claim that the prosecutor withheld information concerning an interview conducted by Kearney police officers with Julie Berlin on December 17, 1996, 7 days after Brown's body was discovered. According to a report bearing that date, Kearney police contacted several of Brown's neighbors, including Berlin, to determine if they had any information about Brown's disappearance or death. In his report, the investigating officer wrote that Berlin reported last seeing Brown on the day before Thanksgiving, and on that same day, "she saw a turquoise, newer model, van, a newer plum Bonneville and a primered vehicle and believed all three vehicles to have been visitors to the Brown residence." Castor's counsel represented to the district court that he first became aware of Berlin's statement when he reviewed police reports contained in the presentence investigation.

The district court overruled Castor's motion for new trial and sentenced her to life imprisonment on the murder charge; 5 to 10 years' imprisonment on each of two forgery counts; 18 months' to 3 years' imprisonment on two other forgery counts; 10 to 20

years' imprisonment for using a deadly weapon in the commission of a felony; 5 to 15 years' imprisonment for being a felon in possession of a firearm; and 1 year's imprisonment on the charge of unauthorized use of a financial transaction device. Castor then perfected this appeal.

## STANDARD OF REVIEW

■ An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

■ In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by such rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. McManus, ante* p. 1, 594 N.W.2d 623 (1999).

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999).

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Ramsay, ante* p. 430, 598 N.W.2d 51 (1999).

## ASSIGNMENTS OF ERROR

Castor assigns, restated, that the trial court erred in (1) refusing to grant her motions for new trial based upon the State's failure to disclose exculpatory evidence in violation of court order, state statutes, and the Due Process Clause of the 14th

Amendment; (2) failing to dismiss or grant other relief when the State failed to preserve and protect exculpatory evidence seized pursuant to a search warrant in violation of the Due Process Clause of the 14th Amendment; (3) excluding the prior deposition testimony of witnesses as substantive evidence and sua sponte instructing the jury that the deposition testimony could be used only for purposes of impeachment; (4) failing to dismiss the forgery counts and unauthorized use of a financial transaction device because there was insufficient evidence as a matter of law; and (5) admitting and using a prior California felony conviction and a prior Nebraska felony conviction.

## ANALYSIS

*Nondisclosure of Exculpatory Evidence.*

Although Castor complains that several items of exculpatory evidence were improperly concealed from her counsel until during or subsequent to trial, we focus our analysis upon the police reports pertaining to interviews with Peterson and Berlin which defense counsel did not discover until after trial, despite several pretrial motions and orders dealing with discovery of exculpatory information. The starting point in our analysis is *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), in which the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434. Under *Bagley,* "materiality" is not determined under a sufficiency of evidence test in that a "defendant need not demonstrate that after discounting the

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." 514 U.S. at 434-35. In this context, materiality is to be determined by considering the suppressed evidence collectively, and "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." 514 U.S. at 435. As we noted recently in *State v. Lotter*, 255 Neb. 456, 487, 586 N.W.2d 591, 617 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999), *Bagley* is also significant for its holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule, and may constitute " ' "evidence favorable to the accused" . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.' " Quoting *United States v. Bagley, supra,* quoting *Brady v. Maryland, supra.*

In addition to constitutional due process requirements, discovery in criminal cases in Nebraska is governed by statute. *State v. Lotter, supra*; Neb. Rev. Stat. § 29-1912 (Reissue 1995). We have construed § 29-1912 as exacting "more than the constitutional minimum" with respect to disclosure of exculpatory information, holding that whether a prosecutor's failure to disclose such evidence results in prejudice to the accused

> depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, *corroborating testimony, or assisting impeachment or rebuttal.*

(Emphasis supplied.) *State v. Kula,* 252 Neb. 471, 486, 562 N.W.2d 717, 727 (1997).

Castor's pretrial motions included a general motion for discovery pursuant to § 29-1912, which included a request for "[d]ocuments, papers, books, accounts, letters, photographs, objects, or other tangible things of whatsoever kind or nature which could be used as evidence by the prosecuting attorney." This motion was sustained. Castor filed a separate motion which specifically requested that the State produce police and other investigative reports and exculpatory information pursuant to its obligation to afford due process as defined in *Brady v.*

*Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Kyles, supra*, as well as decisions of this court applying those principles. In its ruling on this motion, the district court noted the general rule that police and investigative reports are not discoverable, but noted that "[o]bviously an exception to that rule arises if the reports contained exculpatory information which would benefit the defendant." The court ordered production of reports dealing with specific subjects, including the theft of Castor's handgun, threats received by Brown prior to his death, and information placing Brown's death on or after December 1, 1996. Although this order does not specifically refer to the subject matter of the police reports summarizing interviews with Peterson and Berlin, it is clear from the record that the State was on notice of Castor's request for production of exculpatory information. A prosecutor's duty to disclose evidence in response to even a very general discovery request arises if the evidence contains obvious exculpatory characteristics. *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995).

In its summation, the State argued that after Brown fell asleep in his home on November 28, 1996, Castor killed him by firing three shots from the .22-caliber handgun which she had falsely reported stolen. The State argued that Castor initially hid Brown's body in the basement of his house, locking the basement door with the hasp purchased on the day after Thanksgiving, and then late that night, transported the body to a rural location and "dumped" it in the ditch where it was later discovered. The State argued that Castor killed Brown in order to obtain his money.

This argument was based entirely upon circumstantial evidence. The State asked the jury to draw the essential inference that Brown was not shot where his body was found, but, rather, at his home some time earlier. In this regard, the State relied heavily upon the testimony of Jones, the pathologist who performed the autopsy and gave an opinion consistent with the premise that the body was transported after death. As noted, Bux, the pathologist who testified on behalf of Castor, gave a contrary opinion. However, both pathologists agreed that Brown died as the result of three .22-caliber bullet wounds and that his death could have occurred on November 28 or 29, 1996.

Peterson's report of hearing three gunshots in rapid succession on the evening of November 28 or 29, approximately 5 miles from where Brown's body was subsequently found, was favorable to Castor in that it could have supported an inference contrary to the State's theory and consistent with the defense expert's opinion that Brown was killed at the spot where his body was found. At the hearing on the motion for new trial, the State attempted to show that this information was not exculpatory based upon a ballistics expert's testimony that .22-caliber gunshots could not be heard over a distance of 5 miles. However, this issue was not one which the trial court should have been asked to resolve in ruling on the motion for new trial. Rather, it should have been for the jury to consider along with the other circumstantial evidence upon which it was asked to render a verdict.

In presenting its case, the State also sought to discredit Castor's statement to police that she last saw Brown on November 29, 1996, when he left his home with an unidentified person in a pickup which Castor described as "brown with primer on it." Other witnesses testified that Castor had made similar statements to them. In its opening statement, the State told the jury, "[N]o one to this day knows what this brown pickup was all about." In its summation, the State argued:

> Now Wilma Castor is the one telling everybody about the brown pickup. Tom didn't get in a brown pickup. No one can figure out the brown pickup. Wilma Castor has lived there since July by her own admission, not a brown pickup that she can say anything about. This brown pickup is a made up hoax to explain why Tom's not there.
> . . . .
> She [Castor] concocts the story about the pickup to explain Tom's not being home to everybody. And not one person, family or friend, can make an association with this brown pickup. Nobody. Tom did not get into a brown pickup.

Berlin's statement that she observed an unfamiliar "primered" vehicle parked in front of Brown's residence near the time of his disappearance provides some corroboration for Castor's statements that she last saw Brown leaving his home with an uniden-

tified person in a brown pickup "with primer on it." The fact that Berlin could not positively identify the vehicle as a pickup goes to the weight of the evidence, not to its relevance.

The State was aware that its case was based entirely upon circumstantial evidence. It was also aware that Castor claimed she last saw Brown leaving his home with someone in a vehicle with primer on its exterior and that Castor's expert would testify that in his opinion, Brown was not shot at his home, but, rather, at or near the ditch where his body was found. Under these circumstances, the information provided to police by Peterson and Berlin was material to the preparation of the defense and should have been disclosed in response to discovery requests. Since this information was not discovered by defense counsel until after the trial had concluded, we are not presented with the issue of whether the nondisclosure was remediable by continuance. See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999). The State's failure to disclose the information it obtained from Peterson and Berlin deprived Castor of a fair trial, and the district court abused its discretion in not granting her motion for a new trial on those counts charging her with first degree murder and the use of a weapon to commit a felony. Accordingly, we need not address the other alleged discovery violations asserted by Castor as grounds for a new trial. However, we repeat a principle that by this point should not require repetition: " ' "[a] cat and mouse game whereby the [State] is permitted to withhold important information requested by the accused cannot be countenanced. . . ." ' " *State v. Kula*, 252 Neb. 471, 488, 562 N.W.2d 717, 728 (1997), quoting *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983).

*Alleged Failure to Preserve Evidence.*

Castor next contends that the district court erred when it failed to dismiss or grant other relief due to the State's failing to preserve and protect exculpatory evidence it seized pursuant to a search warrant in violation of the Due Process Clause of the 14th Amendment. Specifically, she alleges that a police officer was permitted to testify over her objection that while searching the interior of Brown's home on December 18, 1996, pursuant

to a warrant, he observed a portion of the wall and baseboard behind a sofa which appeared to have been recently cleaned, but took no photographs and did not remove the wall panel and baseboard for further examination. Castor argues that this was prejudicial because the State argued that she had "cleaned" the area in question to remove evidence that she had shot Brown while he was asleep on the sofa. She also contends that the State failed to preserve various items of personal property which had been in the house prior to its search by police and which she contends would have been useful to her defense.

Castor filed a pretrial "Motion to Identify and Preserve Evidence" in which she requested that specific items of physical evidence seized from the crime scene be identified and preserved. The trial court determined that there was no issue ripe for determination because identification of the seized evidence could be accomplished by motion pursuant to § 29-1912 and because Castor was protected by Neb. Rev. Stat. § 29-1913(2) (Reissue 1995) from any destruction of evidence due to neglect or intent. The court did, however, request the State to preserve all seized evidence and not to conduct experiments on evidence that would consume the entirety of the sample being tested.

Subsequently, on August 13, 1997, Castor filed her "Motion to Dismiss or for Other Relief Based on State's Failure to Safely Preserve Evidence at 512 W. 21st St., Kearney, Nebraska." At the hearing on the motion, Castor introduced photographs of the exterior of Brown's house, the search warrants issued, and copies of photographs of the interior of Brown's house. The trial court found that Castor's motion addressed only items taken from the home by police or other items taken by police in their custody as evidentiary matters and that nothing in the motion requested the State to preserve the crime scene, the home, or any contents therein for subsequent investigation by Castor. The court found that Neb. Rev. Stat. § 29-818 (Reissue 1995) was not applicable and that there was no showing of bad faith on the part of the State to substantiate an alleged denial of due process. It therefore denied the motion.

Castor relies in part upon § 29-818, which provides:

> Property seized under a search warrant or validly seized without a warrant shall be safely kept by the officer seiz-

ing the same unless otherwise directed by the judge or magistrate, and shall be so kept so long as necessary for the purpose of being produced as evidence in any trial . . . .

We conclude that this statute has no application in this case because Castor has not identified any item of property seized from Brown's home at the time of its search which was not properly preserved. Rather, her argument appears to be that police failed to seize and preserve certain objects from the house which she contends would be exculpatory.

■ Under certain circumstances, the Due Process Clause of the 14th Amendment may require that the State preserve potentially exculpatory evidence on behalf of a defendant. *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984). To meet the standard of constitutional materiality in such circumstances, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. Additionally, it is uncontroverted that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). See *State v. Tanner*, 233 Neb. 893, 448 N.W.2d 586 (1989). The "presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 57 n.*. See, also, *Tanner, supra*. We find nothing in this record which would indicate that the investigating officers acted in bad faith. Accordingly, we find no merit to this assignment of error.

*Use of Deposition Testimony as Substantive Evidence.*

Because our resolution of the prosecutorial misconduct issue necessitates retrial, we address Castor's contention that the trial court erred when it refused to admit the prior deposition testimony of certain witnesses as substantive evidence and then sua sponte instructed the jury that the deposition testimony could be

used only for impeachment purposes and not as substantive evidence.

Specifically, during the cross-examination of Jimmy Brown, Brown's nephew, Castor offered his inconsistent deposition testimony for "the truth of the matter asserted," claiming it was proper as a past recollection recorded. The State objected, claiming the statement was proper only for impeachment. The court sustained the objection, noting "we'll instruct the jury that the reading of the information to them is simply to be utilized in judging the credibility of the witness at this time and is not to be taken as proof of the matter that's been read to you out of that particular document." Later, during the cross-examination of George Brown, Brown's brother and Jimmy Brown's father, when Castor began questioning him about "inconsistent" statements in his deposition, the court sua sponte noted:

> I'm going to interrupt you just a minute. Ladies and gentlemen, through the course of the trial, you're probably going to hear more questioning that is predicated upon prior statements that people have made in depositions. Unless you are otherwise instructed by me, I want you to understand that when the prior statements are revealed from the deposition, that the purpose of that is to either refresh the memory of the witness or to allow you to know that there is an inconsistent statement for the purpose of judging their credibility as to what is said today. What is said in those depositions is not evidence in this case. But only to either refresh the memory of the witness or to allow you to judge the credibility of their testimony today. And that's unless I otherwise instruct you.

Neither counsel objected to the court's instruction.

Castor bases her assignment of error upon Neb. Rev. Stat. § 27-801(4)(a) (Reissue 1995), which provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . .

Castor contends that under § 27-801(4)(a), prior inconsistent statements made in depositions by certain witnesses, including Jones, Troy Guider, Jimmy Brown, and George Brown, are admissible as substantive evidence and not just to impeach, and the trial court erred in its instruction and in not allowing the evidence.

■ Castor's argument fails to consider Neb. Rev. Stat. § 29-1917 (Reissue 1995). Section 29-1917 provides that "in a felony . . . prosecution, the prosecuting attorney or the defendant may request the court to allow the taking of a deposition of any person other than the defendant who may be a witness in the trial of the offense," and further states that "[a] deposition taken pursuant to this section may be used at the trial by any party solely for the purpose of contradicting or impeaching the testimony of the deponent as a witness," § 29-1917(4). In *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997), we stated that § 29-1917(4) governs the appropriate use of discovery depositions in criminal cases when the deponent is available as a testifying witness. Because the deponents in this case were available for trial and did in fact testify, § 29-1917(4) was applicable and the trial court did not err in limiting the use of the deposition testimony to the purpose of contradicting or impeaching the testimony of the deponent as a witness.

*Evidence Supporting Forgery and Unauthorized Use of Financial Device.*

Castor next contends that the trial court erred when it failed to dismiss the forgery counts and unauthorized use of a financial transaction device count because there was insufficient evidence as a matter of law to establish that Castor signed Brown's name without authorization. Castor moved to dismiss the counts of forgery at the close of the State's evidence and again at the close of all the evidence when she also specifically mentioned the financial transaction device count. The motions were overruled by the court.

Castor was charged with four counts of second degree forgery, involving: check No. 2639, in the amount of $194.08, written to Phillips 66 on November 29, 1996; check No. 2638, in the amount of $2,000, written to "Edward Brown" on

November 27, 1996; check No. 2635, in the amount of $2,000, written to "Wilma Castor" on November 27, 1996; and check No. 2634, in the amount of $140, written to Self Store It Inc. on November 27, 1996. She was also charged with one count of unauthorized use of a financial device, relating to the check card purchases on November 29, 1996. Castor admits she signed Brown's name on the checks and bank card documents but contends she was authorized by Brown to do so.

Nebraska case law clearly establishes that to sustain a conviction for forgery, "it is not sufficient for the State to show that the signature is not that of the party whose name is used, but it must also affirmatively be shown that the signing was made without his authority." *State v. Addison*, 191 Neb. 792, 794, 217 N.W.2d 468, 469 (1974). See, *Crawford v. State*, 164 Neb. 231, 82 N.W.2d 1 (1957); *Berg v. State*, 157 Neb. 863, 61 N.W.2d 837 (1954). The State does not contest that lack of authority is an element that it must prove, but contends that it cannot do so by direct evidence because Brown is dead, and therefore, it must rely upon circumstantial evidence. It contends further that there is sufficient circumstantial evidence to support a finding that Castor was unauthorized to make any financial transactions on Brown's accounts, including the fact that Brown was unaware of the Phillips 66 account when charges were made, that Castor had openly told her coworkers that she was "sponging" off Brown, that she owed Kearney Keno money for insufficient checks, that she told one coworker that she hated Brown, and that she was upset that he had "cut her off" despite the fact that he had considerable funds.

Under the applicable standard of review, our only inquiry is whether, construing the admissible evidence most favorably to the State, there was sufficient circumstantial evidence to establish that Castor was not authorized to sign the checks or to make the Visa check card purchases. We conclude that the circumstantial evidence supporting the State's theory that Castor killed Brown in order to gain access to his funds from which she had been "cut off" is sufficient, if believed by the jury, to establish that Brown did not authorize her use of his check card or her writing of the checks in question. Thus, Castor is not entitled to dismissal of these charges. However, because the proof of these

charges was based upon the same circumstantial evidence utilized by the State in proving the murder and weapons charges, Castor's defense was prejudiced by the State's failure to disclose the information obtained from Peterson and Berlin. Accordingly, we conclude that the district court erred in denying Castor's motion for new trial on the forgery and unauthorized use of a financial device counts.

*Admission of Prior Felony Convictions.*

In her fifth and sixth assignments of error, Castor contends that the trial court erred in finding her guilty of being a felon in possession of a firearm because neither the prior California conviction nor the prior Nebraska conviction relied upon by the State to prove the element of a prior felony conviction was properly admitted.

Neb. Rev. Stat. § 28-1206(1) (Reissue 1995) provides in pertinent part that "[a]ny person who possesses any firearm . . . and who has previously been convicted of a felony . . . commits the offense of possession of a deadly weapon by a felon . . . ." Section 28-1206(2) provides that the "felony conviction may have been had in any court in the United States, the several states, territories, or possessions, or the District of Columbia." The information charges Castor with committing this offense between June 1 and November 30, 1996, and alleges two predicate felonies, including a 1968 conviction in California for "Grand Theft Of A Person," and a 1969 Nebraska conviction for "No Fund Check."

Castor does not dispute being in possession of a firearm, but challenges the admission of evidence relating to both predicate felonies. This evidence includes documents showing that Castor, then known as Wilma Lee Brown, was convicted "of the crime of felony, to wit, grand theft from person" in the Superior Court of California, Kern County, and was sentenced to probation for a period of 5 years, subject to several conditions including that "she serve the first 180 days of said probationary period in the Kern County Jail or other adult detention facility as shall be determined by the County Classification Commission." She was advised by the sentencing judge:

You are privileged under the law if you successfully complete your probationary period and comply with all the terms and conditions to come back into court at the expiration of your probationary period and have your plea of guilty to the charge withdrawn and have a plea of not guilty substituted and have your case dismissed.

Castor first argues that the court records do not establish a final judgment of conviction of a felony under California law because she received a sentence of probation, which under California law allows the retention of all civil rights. In this regard, she relies on the following language from *People v. Banks*, 53 Cal. 2d 370, 386, 348 P.2d 102, 113, 1 Cal. Rptr. 669, 680 (1959):

[T]he defendant whose guilt has been established . . . but who has not been sentenced to prison, i.e., where probation has been granted and the proceedings have been suspended without entry of judgment, is subject to no disabilities whatsoever except those specifically declared by some other provision of law or affirmatively prescribed by the court as terms or conditions of probation. The probationer . . . still retains his ordinary civil rights, unless the court has restricted them[.]

Castor's reliance on *Banks* is misplaced. In that case, the defendant sought to set aside his conviction for being a felon in possession by arguing he was never convicted of the underlying felony. Regarding the underlying felony conviction, Banks entered a plea of guilty to an offense punishable either as a felony or as a misdemeanor. He was sentenced to probation and completed his term of probation without violation. Although Banks was entitled to have the charge dismissed upon application, he did not do so. The court noted that no judgment in the case had been pronounced, because "[a]fter the plea of guilty an order granting probation was entered and there the case rests." *Id.* at 377, 348 P.2d at 107, 1 Cal. Rptr. at 674.

After making the statements upon which Castor relies, the *Banks* court further stated:

[The defendant] does, however, for some specific purposes—for administration of the probation law and other laws expressly made applicable to persons so situated—

> stand convicted of a felony. . . . *Here, upon his plea of guilty . . . the defendant acquired the status—not then final, and conditionally subject to expungement but nevertheless existing—of a person convicted of a felony.*

(Emphasis supplied.) *Id.* at 387, 348 P.2d at 113, 1 Cal. Rptr. at 680. The court went on to note that even full compliance with the terms of his probation did not absolve Banks of his felon status without his taking the additional step of applying to have the charge dismissed pursuant to statute, and thus it found his prior felony conviction was valid and admissible in the felon in possession case.

As in *Banks*, the record in this case does not reflect any action on the part of Castor to set aside her guilty plea based upon satisfactory completion of the terms of her probation. Thus, although just as in *Banks* there is no actual judgment appearing on the record, once Castor pled guilty, her status under *Banks* was that of a convicted felon under California law.

Castor also contends in her brief that the California court records fail to show a "knowing and intelligent waiver of [her] constitutional right to trial, trial by jury, confront[ation of] witnesses . . . and presumption of innocence." Brief for appellant at 47, citing *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). The State contends that any argument made by Castor based on *Boykin* is invalid because her felony conviction occurred in 1968, while *Boykin* was not decided until 1969. Further, the State argues that even if *Boykin* were applicable, Castor is barred from now collaterally attacking the validity of the California conviction.

We held in *State v. Lee*, 251 Neb. 661, 558 N.W.2d 571 (1997), that a defendant cannot collaterally attack, on *Boykin* grounds, a prior conviction that is an element of a subsequent offense. A prior felony conviction is an essential element of the offense of felon in possession of a firearm. *State v. Haynes*, 192 Neb. 445, 222 N.W.2d 358 (1974). Thus, Castor may not collaterally attack her California conviction in order to prevent its use as a predicate felony under § 28-1206(1).

A single prior felony conviction is sufficient to support a conviction under § 28-1206(1). Because we conclude that the district court did not abuse its discretion in admitting Castor's

felony conviction in California, we need not reach her argument regarding the admissibility of her prior conviction in Nebraska. Because there is uncontroverted evidence that Castor was a felon in possession of a firearm prior to Brown's death, her conviction on this charge is not affected by the State's nondisclosure of exculpatory evidence and it is therefore affirmed.

## CONCLUSION

There was no prejudicial error with respect to Castor's conviction on the offense of possession of a firearm by a felon, which is one of the convictions included in case No. S-98-510, and that conviction is hereby affirmed. However, all other judgments of conviction from which appeal was taken in case No. S-98-510, as well as the conviction appealed in case No. S-98-509, are reversed and remanded for a new trial because of the State's failure to disclose exculpatory information in its possession pursuant to Castor's request. Accordingly, the judgment in case No. S-98-509 is reversed and remanded for a new trial, and the judgment in case No. S-98-510 is affirmed in part, and in part reversed and remanded for a new trial.

JUDGMENT IN NO. S-98-509 REVERSED, AND CAUSE REMANDED FOR A NEW TRIAL.

JUDGMENT IN NO. S-98-510 AFFIRMED IN PART AND IN PART REVERSED, AND CAUSE REMANDED FOR A NEW TRIAL.