STATE OF NEBRASKA, APPELLEE, V.
KELLY R. SHIPPS, APPELLANT.
656 N.W.2d 622

Filed February 21, 2003. No. S-02-475.

J. Bruce Teichman for appellant.

Don Stenberg, Attorney General, and Kevin J. Slimp for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE
Kelly R. Shipps appeals from his conviction for kidnapping.

## SCOPE OF REVIEW
■ The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Haltom*, 264 Neb. 976, 653 N.W.2d 232 (2002).

■ In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002).

## FACTS

Shipps pled not guilty to four counts filed in the Hall County District Court: kidnapping, a Class IA felony, in violation of Neb. Rev. Stat. § 28-313(1) (Reissue 1995); first degree sexual assault, a Class II felony, in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 1995); robbery, a Class II felony, in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 1995); and burglary, a Class III felony, in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1995). The charges were based on events which occurred in June 2001 involving D.H., a woman Shipps had met in 1999 and with whom he had been involved for about 2 years.

On June 19, 2001, Shipps went to D.H.'s home in the afternoon, and D.H. told Shipps that they should not see each other any more. That night, D.H. went to bed between 11 o'clock and midnight. At about 2 a.m., she was awakened by Shipps, who was holding her wrists in the air very firmly. He said, " 'We're going to have sex whether you want to or not.' " D.H. testified that she asked Shipps not to hurt her and then got up and undressed because she knew from the tone of his voice that Shipps was serious and she did not want to "get beat up."

D.H. said she did not think she could get away from Shipps or resist having sex with him. During the night, they had sex twice. Shipps went to the bathroom once during the night, but D.H. did not try to leave because she thought she would be safe if she allowed Shipps to stay until he went to work in the morning.

At about 5 a.m. on June 20, 2001, D.H. arose, dressed, and made coffee because Shipps said he was going to work soon. Shipps appeared in the kitchen undressed and said he wanted D.H. to have sex with him again. D.H. said that Shipps talked her into doing so and that they returned to the bedroom, where they had sex again. D.H. then got up and began to dress because she thought she would need to drive Shipps to work.

Before D.H. could put on a blouse, Shipps playfully pushed her down onto the bed. Shipps then got on D.H.'s stomach and chest, slipped twine around one of her wrists, and yanked the twine until it was tight. Shipps yelled at D.H. and accused her of using him. He then looped the twine twice around her neck. D.H. repeated, " 'You don't want to do this.' " Shipps said he wanted D.H.'s other hand, and as she started to give it to him, D.H. began screaming.

Shipps told her that if she did not let him tie her up, he would beat her. D.H. said that she gave him her wrists and that he tightened the twine around her neck. D.H. began praying, and Shipps said, " 'You better pray.' " He then tied the twine to the bedposts.

Shipps left the room and returned with duct tape, which he put over D.H.'s mouth and around her ankles. Shipps left again, but he returned, untied the twine, and helped D.H. get up as she motioned toward the bathroom. He removed the duct tape from her mouth. Shipps picked up D.H., threw her over his right shoulder, and carried her down the basement stairs into the washroom, where he put her down by a table. Shipps indicated that D.H. should walk the rest of the way to the bathroom, but she said she could not walk. Shipps picked her up, carried her into the bathroom, helped her pull down her pants, and sat her on the stool.

Shipps went back upstairs and returned with a light bulb because there was no other light downstairs. He told D.H. he would be back after work. Shipps then went upstairs and got the duct tape. He put more duct tape on the twine, tied D.H.'s hands together, and put tape around her hands, chest, and arms. Shipps asked her if she was all right, and he then left the room.

Although D.H. felt that the twine was a little loose, she sat and waited 30 to 45 minutes for Shipps to leave for work. When she could not hear any noise in the house, she pulled her arms out of the twine, removed the duct tape from her mouth, and used her teeth to unfasten some of the tape. She used her belt buckle to scratch through the duct tape on her legs. She pushed at the bathroom door and was able to push boxes off a table that Shipps had placed in front of the door. She ran upstairs, unlocked the back door, and then went to get her purse. She next ran into the bedroom, grabbed a shirt, and ran to a neighbor's house, but no one was home.

D.H. then ran two to three blocks to a friend's house. After the police were called, D.H. was taken to a hospital for medical examination. She also discovered that her billfold, which had contained $2 to $3, was missing.

The friend testified that when D.H. arrived that morning, D.H. was shaking, traumatized, and very upset. D.H. was carrying her purse on one arm, her belt buckle was hanging from her pants, and there was duct tape residue at the bottom of her pants. The

friend observed red marks about a half-inch wide on D.H.'s neck and wrists.

A police officer found D.H.'s vehicle in a parking lot about a block north of Shipps' workplace. In a search of D.H.'s house, police found twine and pieces of duct tape, but no evidence of forced entry.

Shipps testified that he was married and had three children. Shipps said that during his relationship with D.H., he bought groceries and paid her gas bills, car payments, car insurance, and rent. Shipps said he also shoveled snow, mowed, did general housekeeping, repaired items around the house, and helped D.H. move once before he injured his hand. Shipps said he and D.H. did not socialize with others because D.H. did not want people to know they were together.

Shipps testified that he was at work on June 19, 2001, when D.H. called and asked him to buy some twine, which he purchased at a hardware store after work. When he showed her the twine, she said it was not the right kind to use for a clothesline. Shipps said he went to physical therapy at 3 p.m. and then to a friend's house. He returned to D.H.'s house at 12:45 or 1 a.m. and knocked on the door, and D.H. let him in. They went to bed, had sex, and then went to sleep. Shipps said he woke up at 6 a.m. and took D.H.'s vehicle to work. He said they had argued about money and about Shipps' providing support to D.H. Shipps said he had told D.H. that he could not afford to pay her bills all the time and that the relationship needed to end. He later testified that he and D.H. argued when she said she wanted to break off the relationship. Shipps said he did not break into D.H.'s house and did not have sex with her without her permission. He stated that he never beat or threatened her and that he did not bind her with twine and duct tape.

A jury found Shipps guilty of kidnapping and not guilty of the other three charges. His motion for new trial was overruled at the time he was sentenced on April 2, 2002. The trial court sentenced Shipps to life imprisonment, which is the required sentence for a Class IA felony. See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2002).

On April 8, 2002, Shipps filed a supplementary motion for new trial, asserting that the State had failed to disclose it had

information concerning whether Shipps was able to use his right hand at the time of the alleged incident. That motion was also overruled. Shipps appeals from the denial of his motions for new trial.

## ASSIGNMENTS OF ERROR

Shipps asserts numerous errors that can be summarized as follows: (1) The trial court erred in denying his motions for mistrial and for new trial based on the State's comments during voir dire that Shipps was a married man who had engaged in an adulterous relationship; (2) the trial court erred in denying his motions for mistrial and for new trial based on the State's production of inflammatory, prejudicial, and irrelevant testimony from a witness in violation of U.S. Const. amend. XIV and Neb. Const. art. I, § 3; (3) the trial court erred in failing to grant a new trial when the State wrongfully withheld exculpatory material which had been requested during discovery, depriving Shipps of a fair trial under U.S. Const. amend. XIV and Neb. Const. art. I, § 3; (4) the trial court erred in failing to grant a new trial based on prosecutorial misconduct; and (5) cumulative trial error denied Shipps his constitutional right to a fair trial.

## ANALYSIS

### STATE'S REMARKS DURING VOIR DIRE

Shipps asserts that the trial court erred in denying his motions for mistrial and for new trial based on the State's remarks during voir dire that Shipps was a married man who had engaged in an adulterous relationship.

During voir dire, the trial court asked a number of questions of the prospective jurors, and then the State began its questioning by indicating that the case involved sexual matters. The prosecutor said:

> The evidence, I think, is going to show, ladies and gentlemen, that when the defendant, Kelly Shipps, was having — he had a relationship with an individual named [D.H.,] who is the victim. At the time that Mr. Shipps and [D.H.] were having the relationship, Mr. Shipps was still married. Do any of you feel that the fact that —

At that point, defense counsel objected, and a sidebar conference was held. Defense counsel's motion for a mistrial was overruled.

The prosecutor then asked, "Do any of you feel that if a woman is engaged in a relationship with a married guy, that means she deserves whatever she gets? In other words, it's okay to sexually assault somebody if they've been having an affair?" The defense raised no objection to these questions. The State continued its line of questioning about sexual relationships and sexual assault without objection.

During defense counsel's questioning on voir dire, he stated:

[Y]ou heard statements before that Mr. Shipps was married, and the testimony will come out that Mr. Shipps indeed was married. Mr. Shipps had had a long-time relationship with the complaining witness, [D.H.,] and that this — that Mr. Shipps spending the night with [D.H.] was a frequent event despite the fact he was married, and does the fact — well, does the fact that this information will come out, will this cause you to be prejudiced to Mr. Shipps so that you wouldn't be able to provide a fair verdict for him? And that means following the judge's instructions?

Counsel continued:

This is a case involving a married man who's had a relationship. I think the term of art is a meretricious relationship with another woman, and now he's accused of having sex with this other woman without her consent.

Would this cause you any problems in judging this case and following the judge's instructions?

At one point, the trial court intervened and stated:

Whether or not the victim or the defendant was married is not an element of [the] crime, so it is not relevant to the proof in this case. So given that, do you think you would be able to fairly judge it, knowing that the defendant was or was not a married man, and simply stick to what I tell you the State has to prove?

Shipps claims that the prosecutor's comments about the relationship between Shipps and D.H. poisoned the proceedings from the beginning because his marital status and the adulterous relationship had no relevance to the charges brought against him.

 The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Haltom,*

264 Neb. 976, 653 N.W.2d 232 (2002). A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999). In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002).

■ The right of both parties in a criminal action to question prospective jurors is well established. This court has long held that voir dire examination of prospective jurors

> requires the trial court to give each of the parties the right, within reasonable limits, to put pertinent questions to each and all of the prospective jurors for the purpose of ascertaining whether or not there exists [sic] sufficient grounds for challenge for cause and also to aid each of the parties in the exercise of the statutory right of peremptory challenge.

*Oden v. State*, 166 Neb. 729, 735, 90 N.W.2d 356, 360 (1958).

The *Oden* court cited to *Strong v. State*, 106 Neb. 339, 340, 183 N.W. 559, 559-60 (1921), in which the court stated:

> The principal purpose of the *voir dire* examination is to ascertain whether the proposed juror is free from bias or prejudice, and whether he is in such attitude of mind with respect to the case in hand that he would be a fair and impartial juror. With this end in view, it is the policy of the law to give to the parties ample opportunity to question the venireman upon matters bearing upon his competency, and questions which tend to show his attitude of mind and feelings should not be unreasonably abridged. And as each party has the right to exercise a certain number of peremptory challenges, it is proper, within reasonable limits, to propound questions which, in the judgment of the respective parties, may assist them in the exercise of that right. The extent to which the examination may be carried rests in the sound discretion of the trial court, and its ruling will not be disturbed unless there has been an abuse of discretion to the prejudice of the party complaining.

See, also, *Trebelhorn v. Bartlett*, 154 Neb. 113, 47 N.W.2d 374 (1951).

The questions asked by the prosecutor during voir dire can be interpreted as an attempt to determine the "attitude of mind and feelings" of the jurors. See *Strong*, 106 Neb. at 340, 183 N.W. at 559. The State has the right within reasonable limits to ask questions which will assist it in exercising its peremptory challenges. Shipps was charged with sexual assault. The relationship between Shipps and D.H. included consensual sex, and it may have been important for the State to ask prospective jurors whether they could determine the case based solely on the evidence or whether they had preconceived notions about the character of the parties. The defense also asked questions about the issue after objecting to the State's comments, indicating that the defense had concerns about the jury's thoughts and feelings related to an adulterous relationship.

The trial court did not abuse its discretion in denying both the motion for mistrial and the motion for new trial on the basis of the State's remarks during voir dire. These assignments of error have no merit.

### TESTIMONY OF SANDY HULL

Shipps argues that the trial court erred in denying his motions for mistrial and for new trial based on the State's production of inflammatory, prejudicial, and irrelevant testimony from Sandy Hull in violation of U.S. Const. amend. XIV and Neb. Const. art. I, § 3. Hull was called as a witness on behalf of the State.

Shipps' defense was based, at least in part, on a claim that he had been injured and did not have full use of his right hand at the time of the alleged incident. Hull, a friend of Shipps, testified that during the week of June 20, 2001, Shipps could not help move a couch because of his injury. Hull had earlier told a police officer that Shipps was able to help move the couch. Hull said that Shipps could use his right arm, but not his right hand. Hull added that he had seen Shipps move a small dresser with his left hand and right arm, but Hull never saw Shipps grasp anything with his right hand.

Hull also testified that for 2 years prior to the alleged crime, Shipps and Hull played pool together several times a week.

Shipps stopped playing pool with his right hand after his work accident because he could not hold a pool cue in that hand. He subsequently tried to play pool with his left hand. Hull saw Shipps playing pool left handed approximately 1 week before June 20, 2001.

Shipps objected when the State questioned Hull as follows: "Q[.] You were a very good friend of [Shipps], is that correct? A[.] Yes. Q[.] Okay. In fact, during 2001 you would perform a favor for [Shipps], if women stopped by your house . . . ." Defense counsel interposed an objection to the question as leading and irrelevant. Arguments on the objection were held in camera, with both parties waiving the presence of a court reporter. The objection was overruled.

The State proceeded with its questioning: "If a woman stopped by your place . . . and asked for [Shipps], what would you tell [her]?" Defense counsel again objected, on grounds of foundation and that the form of the question was hypothetical, and the objection was overruled. Hull stated that he would tell the woman that Shipps was living there but was not home at the time. Hull admitted that Shipps was not in fact living there and that he had lied for Shipps. On recross-examination, Hull stated that he did not know where Shipps was when he was not at Hull's house, but that Shipps could have been at D.H.'s house.

At trial, Shipps first objected as to the relevance of the question about Hull's performing a favor for him. Shipps' second objection was based on foundation and the form of the question. In his brief, Shipps also objects to the use of Hull's testimony as impeachment. Shipps argues that this testimony, on collateral matters, was used to impeach at a time when he had not decided whether he was going to testify at trial, and that thus, he was forced to modify his trial strategy in order to address the impeachment.

The record shows that Shipps' complaints concerning whether this testimony constituted improper impeachment were not raised before the trial court. On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered to the trier of fact. *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *Id.* Thus, Shipps has

waived any objection that might have been made to Hull's testimony on the basis of impeachment.

It appears that the State's questions were intended to demonstrate that as a friend of Shipps, Hull was willing to be less than truthful. Neb. Rev. Stat. § 27-607 (Reissue 1995) provides that the credibility of a witness "may be attacked by any party, including the party calling him." See, also, *State v. Marco*, 220 Neb. 96, 368 N.W.2d 470 (1985). The relationship between Hull and Shipps could be seen as close enough that Hull was willing to show bias in his testimony. The State was attempting to demonstrate this bias, and its questioning was not improper. The trial court did not abuse its discretion in failing to grant a mistrial or new trial on the basis of Hull's testimony.

### BRADY VIOLATION

Shipps asserts that the trial court erred in failing to grant a new trial after the State wrongfully withheld exculpatory material which had been requested during discovery, depriving Shipps of a fair trial under U.S. Const. amend. XIV and Neb. Const. art. I, § 3.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution. *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). Favorable evidence is material, and constitutional error results from its suppression by the State, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* A reasonable probability of a different result is accordingly shown when the State's evidentiary suppression undermines confidence in the outcome of the trial. *Id.*

This assignment of error relates to Shipps' claim that because of the injury to his hand in March 2001, he would have been prevented from binding D.H. as she described. Shipps testified that he worked as an apprentice meatcutter at a grocery store and that he was not able to use his right hand in June 2001.

Rhonda Skiles, human resource coordinator for the grocery store in question, testified that on March 27, 2001, when Shipps filled out a workers' compensation claim, his hand was wrapped in a bandage and was in a splint held tightly to his torso. She said she told Shipps' supervisor that Shipps was not to use his right hand and that he should do no pushing, pulling, grasping, or fine manipulation of any type with his right hand. He was to be assigned only left-hand work. The restrictions continued through June 2001.

Rodney Thorngate, manager of the meat and seafood departments at the grocery store, testified that Shipps injured his right hand in March 2001 and was placed on light duty. By June, Shipps was able to stock shelves with his left hand if someone else opened boxes for him, and he could perform cleaning tasks. Shipps was not expected to grip, push, lift, or exercise any fine tasks with his right hand. Thorngate said he observed Shipps balancing items on his right shoulder, elbow, and upper arm.

Rory Miles, a friend of Shipps, testified that in June 2001, Shipps was not playing in a pool league because he had cut his hand in a meat grinder at work.

D.H. testified that Shipps helped her move in May 2001 and that during the move, she saw Shipps picking up items with both hands or with his left hand and his right forearm. D.H. said she saw Shipps use his right hand between May 15 and June 20. At first, he was unable to do much with it, but then he could pick up light items. D.H. said Shipps had more strength when he held the hand in a certain position. She could not remember whether he was using one hand or both hands when he was tying her with the twine or using the duct tape.

Shipps argues that the evidence at trial was equally balanced as to whether he was able to use his right hand at the time of the alleged incident. Shipps claims that when he and his defense counsel reviewed the presentence investigation report on April 2, 2002, the day of sentencing, they found a report concerning a followup interview completed by Investigator Kelly Williams of the Grand Island Police Department. The report stated that Rhonda White had told Williams on September 10, 2001, that she saw Shipps about once a week between the time of his hand injury and the time he was arrested. She said he periodically stayed

overnight at her home and that for a time, he lived with her. White reported that she never saw Shipps without a brace on his hand, nor did she see him use the injured hand for any purpose.

Williams testified during the State's rebuttal that when he first observed Shipps at Shipps' place of employment, Shipps' right arm was in a brace, without a sling. Shipps' counsel had interviewed White on other matters, but counsel claims that he did not know that White had made the above-mentioned statement concerning Shipps' hand and brace to police and that he did not learn of it until 6 weeks after trial, at the time of Shipps' sentencing.

Shipps argues that White's statements to Williams could have been used to impeach Williams' testimony. This argument is difficult to comprehend. To "impeach" means "[t]o discredit the veracity of (a witness)." Black's Law Dictionary 755 (7th ed. 1999). White told Williams that she had seen Shipps wearing a brace on his hand and that she did not see him use the hand. Williams also testified that he saw a brace on Shipps' hand. Shipps argues that he could have used the report of the interview with White to discredit the veracity of Williams' testimony. White and Williams testified to the same fact—seeing Shipps with a brace on his hand. This alleged error has no merit.

The State argues that Shipps has waived this allegation of error because he made no objection to the presentence investigation report when asked if he was prepared for sentencing on April 2, 2002. We do not decide the waiver issue because Shipps has not shown that Williams' report is a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

To meet the standard of a due process violation, alleged undisclosed exculpatory evidence must be " 'material either to guilt or to punishment.' " See *State v. Castor*, 257 Neb. 572, 584, 599 N.W.2d 201, 211 (1999). Shipps presented other evidence concerning his hand injury, and the jury was free to take it into consideration. For constitutional error to result from nondisclosure of evidence, there must have been " ' "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " *Id.* The mere fact that one more witness could have testified concerning

whether Shipps was able to use his hand does not support a finding that the result of the trial would have been different.

The police report describing the interview with White did not prejudice Shipps, whose counsel had previously interviewed White. We conclude that any failure to disclose the report does not undermine confidence in the outcome of the trial, and this assignment of error therefore has no merit.

### PROSECUTORIAL MISCONDUCT

■ Shipps assigns as error the trial court's failure to grant a new trial based on prosecutorial misconduct. The conduct of a prosecutor which does not mislead and unduly influence the jury and thereby prejudice the rights of the defendant does not constitute misconduct. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). As noted above, none of the actions of the prosecutor constituted misconduct, nor did they mislead or unduly influence the jury. The court did not abuse its discretion in failing to grant a new trial on this basis.

### CUMULATIVE TRIAL ERROR

Finally, Shipps alleges that he was denied his constitutional right to a fair trial by cumulative trial error, reasserting the errors discussed above.

■ A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the verdict. *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001). The jury heard the first-person account of D.H., who described the events of the day in question. It heard the testimony of D.H.'s friend, who observed D.H. immediately after she escaped. It heard Shipps' own testimony as to his actions on the day in question. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). The evidence here is sufficient, and the assigned errors do not require a new trial.

## CONCLUSION

The trial court did not abuse its discretion in denying Shipps' motions for new trial and for mistrial based on the State's comments during voir dire, the introduction of testimony from Hull, or any other alleged prosecutorial misconduct. The court did not err in failing to grant a new trial based on the alleged failure to disclose exculpatory material per *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and we do not find cumulative trial error which demonstrates that Shipps was denied his constitutional right to a fair trial. Thus, the judgment of conviction is affirmed.

AFFIRMED.