STATE OF NEBRASKA, APPELLEE, V.
WILMA L. CASTOR, APPELLANT.
632 N.W. 2d 298

Filed August 10, 2001. Nos. S-00-541, S-00-563.

James R. Mowbray, Robert W. Kortus, and Jerry L. Soucie, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MCCORMACK, J.

## NATURE OF CASE

Thomas E. Brown (Brown) was found dead outside Kearney, Nebraska, on December 10, 1996. His ex-wife, Wilma L. Castor, was arrested and charged with one count of first degree murder, one count of use of a weapon to commit a felony, three counts of forgery, one count of being a felon in possession of a firearm, and one count of unauthorized use of a financial transaction device in connection with the events surrounding Brown's death. Castor was separately charged with another count of forgery. The cases were consolidated for trial. Castor was convicted on all charges. Her convictions on all but the felon-in-possession charge were reversed in *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). Castor was then retried on all but the felon-in-possession charge and was convicted on all remaining counts. In these consolidated cases, Castor now appeals these convictions. We affirm.

## BACKGROUND

Castor and Brown were married in 1967 and divorced in 1975. They had two sons, Tom Brown, Jr. (Tom, Jr.), and Edward Brown (Eddy). In July 1996, Castor came to live with Brown in Kearney because Castor needed money and Brown offered to pay her living expenses. Castor slept in a second-floor bedroom, and Brown usually slept on a sofa in the living room. Eddy, though he lived in Oregon with his girl friend, stayed at Brown's home for extended periods of time during 1996. Also living at the Brown residence until October 1996 was Todd Guider, Brown's stepson.

On October 9, 1996, Castor reported a burglary at the Brown home. The police officer investigating the burglary testified that he found 12-by-12-inch holes had been cut in the window screens in Castor's and Guider's bedrooms. Castor reported that she was missing her .22-caliber Ruger revolver and some change. No one was ever arrested for the burglary, and the investigation ended that same day.

Brown, who had worked for a railroad for approximately 28 years, took some time off during the week of Thanksgiving 1996. According to Castor and Eddy, they and Brown had Thanksgiving dinner together on November 28, 1996. While no one else claims to have seen Brown alive after Thanksgiving Day, Castor and Eddy maintain that they went shopping with him the next morning. Brown's Visa check card was used to make purchases at three stores in Kearney on Friday, November 29. Castor claims that Brown was present and authorized all the transactions. That same morning, Castor and Eddy deposited two $2,000 checks, dated November 27, 1996, and drawn on Brown's account, into their joint checking account and withdrew $300 cash. Castor claims that she wrote these checks as gifts at Brown's direction.

Castor and Eddy maintain that upon arriving back at the house, Brown walked out to the street and got into a brown and/or primer-colored pickup truck, saying he was going to work on another truck. Castor and Eddy claim that they did not see Brown alive again.

Castor went to work that evening, but got off early at about 11:50. She had been planning to move to Reno, Nevada, on December 6, 1996, but at some point, changed her plans and decided to go with Eddy to Oregon on November 30. After getting off work, Castor made several trips to a storage facility until about 2:30 or 3 a.m. She had paid for this facility with a check written on Brown's account, to which she had signed Brown's name. Castor and Eddy then drove to Grand Island, ostensibly to pay some insufficient funds checks before leaving for Oregon. The two stayed a few hours in a motel and then drove back to Kearney. They then loaded up their cars and left around noon, driving to North Platte, where they spent the night. They eventually arrived in Oregon on December 2.

Brown remained missing, but on December 10, 1996, he was found dead at the bottom of a roadside ditch in rural Buffalo County, northwest of Kearney. Brown had been shot twice in the chest and once in the neck. His body was dressed in a yellow shirt, sweatpants with jeans over them, and gray socks. He was lying on his back with his feet extended up toward the road. His head was lower than his legs because of the slope of the ditch. Brown's shirt was pulled up and twisted, causing his stomach to be exposed, and his jeans and sweatpants were pulled down to his thighs. There were no shoes or coat on the body. The police found Brown's glasses and several small spots of blood near the edge of the ditch.

After the discovery of Brown's body, officers from the Kearney Police Department and the Buffalo County Sheriff's Department conducted various searches of Brown's residence. They never found a certain blanket Brown always used when he slept on the sofa. They found no significant blood at Brown's residence.

A jury trial was held, and Castor was convicted on all counts, but this court reversed the judgment on all but the felon-in-possession charge and remanded the cause for a new trial because certain exculpatory evidence had been withheld from Castor. See *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). At the second trial, the State contended that Castor became angry that Brown had "cut her off" from getting his money and killed him on November 28, 1996, by shooting him three times while he was sleeping on the blanket on the sofa in his home. The State maintained that later, with Eddy's help, Castor hid Brown's body in the basement of the house until she and Eddy could dispose of it the following night. The State argued that Castor bought and installed a hinge hasp on the basement door on Friday, November 29, to prevent any visitors from going downstairs and finding Brown's body. The State contended that Castor used Brown's check card to make purchases on Friday and forged the two $2,000 checks drawn on Brown's account. The State also argued that Castor uncharacteristically volunteered to pay half of the motel bill of Todd Michalski, Brown's nephew, who had come to Kearney at Brown's invitation, in order to prevent him from going to Brown's house and discovering Brown's body. The State maintained that sometime

after Castor left work on November 29, she and Eddy took Brown's body out into the country, disposed of it in a ditch, and then prepared for their trip to Oregon.

The defense sought to contradict the State's theory with the testimony of Bruce Petersen and his son Josh Petersen, both of whom live on a farm near where Brown's body was found. They both testified that on either November 29 or 30, 1996, they heard three shots fired at dusk. The State rebutted their testimony with the testimony of Douglas Whicker, an acoustical consultant, who had performed an experiment to determine how far away a shot fired from the scene where Brown's body was found could have been heard on November 29 or 30. He concluded that based on his observations as well as the topography of the area and the weather on those nights, the maximum distance from which the shots could have been heard would have been 25,000 feet. The distance from the location of the body and the farmhouse is 26,000 feet. Thus, Whicker concluded that any shots fired from the location where the body was found could not have been heard at the Petersens' home.

Castor was again convicted on all counts, and from these convictions, she now appeals.

## ASSIGNMENTS OF ERROR

Castor assigns two errors: (1) The trial court erroneously refused to allow the testimony of Mark Downey, who was in jail at the same time as Eddy, to be received on a substantive basis and incorrectly limited its admission to its impeachment value, in contravention of Neb. Rev. Stat. § 27-803(23) (Cum. Supp. 2000); *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); the 6th and 14th Amendments to the U.S. Constitution; and Neb. Const. art. I, §§ 3 and 11, and (2) there is insufficient evidence to support each of the seven convictions.

## STANDARD OF REVIEW

■ In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the

discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001).

■ A judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001).

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Abbink*, 260 Neb. 211, 616 N.W.2d 8 (2000).

■ Circumstantial evidence is not inherently less probative than direct evidence. *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997); *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

## ANALYSIS

### DOWNEY'S TESTIMONY

Castor first argues that Downey's testimony should have been admitted in evidence for its truth, not merely for its impeachment value. Downey testified when called by the defense that Eddy told him while they were in jail together that he (Eddy) had shot Brown. The State, in rebuttal, called Officer Mike Young, who had interviewed Downey. Young testified that Downey had first said Eddy admitted to shooting Brown, but later, Downey changed his story and said that Eddy told Downey he did not shoot Brown but knew who did. Castor argues that this testimony was trustworthy and thus should have been admitted under § 27-803(23) despite the fact that Castor did not notify the State until after trial had begun that she was going to use this testimony. Castor urges this court to change its "unbending" adherence to the notice requirement under § 27-803(23) and argues for a more flexible approach. Brief for appellant at 18. Castor also claims that the State was not prejudiced by the lack of notice.

 Eddy's alleged confession in this case is clearly hearsay. See Neb. Rev. Stat. § 27-801(3) (Reissue 1995). Hearsay is not admissible except as provided by the rules of evidence. See Neb. Rev. Stat. § 27-802 (Reissue 1995). Section 27-803(23) provides that the hearsay rule does not exclude:

> A statement not specifically covered by any of the . . . exceptions [listed in § 27-803] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact, (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his or her intention to offer the statement and the particulars of it, including the name and address of the declarant.

Thus, in determining whether a statement is admissible under the residual exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, the materiality of the statement, the probative importance of the statement, the interests of justice, and whether notice was given to an opponent. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996) (analyzing Neb. Rev. Stat. § 27-804(2)(e) (Reissue 1995), which is identical to § 27-803(23) except that it requires declarant to be unavailable); *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993) (same).

We need address only the notice requirement issue here, as our decision on that issue is dispositive. As quoted above, § 27-803(23) requires that in order for a statement to be admitted under the residual exception, the statement's proponent must notify the adverse party of his or her intent to offer the statement, as well as the particulars of the statement, sufficiently in advance of trial to provide the adverse party with a fair opportunity to prepare to meet it. Castor notified the State on February 3, 2000, that

she intended to use Downey's testimony. However, the trial in this case actually began on February 1, so the notice Castor provided was during the trial, not "in advance of the trial" as the rule requires. The plain language of the statute states that notice must be given in advance of the trial, not during trial.

Castor, however, argues that the State was not prejudiced because it knew of Eddy's statements to Downey and thus had sufficient notice of their possible use. We have previously rejected this argument in the context of § 27-804(2)(e), which is an identical residual exception applicable when the declarant is unavailable. In *State v. Boppre*, 234 Neb. 922, 952, 453 N.W.2d 406, 428 (1990), we stated that under § 27-804(2)(e):

> [I]t is not enough that the adverse party is aware of the unavailable declarant's statement; the proponent of the evidence must provide notice to the adverse party of his intentions to use the statement in order to take advantage of the hearsay exception in § 27-804(2)(e). Because [defendant] did not provide the necessary notice, he cannot take advantage of the exception.

Likewise, in *State v. Leisy*, 207 Neb. 118, 129, 295 N.W.2d 715, 723 (1980), we stated that "[t]he giving of such notice is one of the requirements necessary to make such evidence admissible" and held that the notice provision in § 27-804(2)(e) is mandatory. We find no principled ground for deciding differently under § 27-803(23). Indeed, we have previously found it to be error to overrule an objection to the introduction of evidence under this exception where the proponent of the evidence has not given notice to the adverse party. See *State v. Reed*, 201 Neb. 800, 272 N.W.2d 759 (1978). .

Thus, based on the language of the statute and the prior decisions by this court, we conclude that Downey's testimony was properly excluded as substantive evidence because Castor failed to give the State notice before trial of her intent to use the testimony.

Castor argues, however, that under *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), failure to allow Downey's testimony for its truth violates her due process rights. In *Chambers*, the defendant sought to prove that a third party committed the murder for which the defendant was

charged. *Id.* Under Mississippi's "voucher" rule, the defendant was precluded from cross-examining the third party because the defendant himself had called the third party as a witness. *Id.* In addition, the defendant was precluded from calling witnesses to testify that the third party had confessed because the statements they would have relayed were hearsay. *Id.* The Court found that the combination of these circumstances denied the defendant a fair trial. *Id.*

In regard to the hearsay issue, the Court stated that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." 410 U.S. at 302. The Court, reasoning that the hearsay rule may not be applied mechanistically to exclude evidence that bore persuasive assurances of trustworthiness and that was critical to the accused's defense, concluded that the exclusion of the third party's statements constituted a violation of "traditional and fundamental standards of due process." *Id.*

Given that the Court expressly stated that it was not announcing any new principles of constitutional law and that its holding was limited to the facts and circumstances of that case, there is some question whether *Chambers* mandates the admission of third-party confessions. We need not decide that question, however, because, in any event, the defendant here has not met the standards the Court used in *Chambers v. Mississippi, supra.* See *State v. West*, 437 So. 2d 256 (La. 1983).

In reaching its conclusion, the Court in *Chambers* stated, "In the exercise of this right [to present witnesses in one's defense], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." 410 U.S. at 302. Section 27-803(23) establishes that as a matter of procedure, the proponent of a statement must notify the adverse party of his or her intent to use the hearsay statement in advance of trial in order for the statement to be admitted under the residual exception. In this case, Castor did not notify the State in advance of trial. She therefore has not complied with the established rule of procedure and cannot now complain of the trial court's exclusion of the testimony as substantive evidence. See *Jackson v. State*, 284 Ark. 478, 683 S.W.2d 606 (1985) (affirming trial court's exclusion of evidence under

*Chambers* in part because defendant failed to follow established procedure for admitting evidence). The exclusion of the evidence here results from Castor's own failure to comply with a procedural rule, not from the "mechanistic" application of the rules of evidence. See *Chambers v. Mississippi, supra.* Because Castor is responsible for the inadmissibility of the evidence, it is difficult to understand how her due process rights could have been violated by the State. We conclude that the trial court did not abuse its discretion in admitting Downey's testimony only for its impeachment value.

### SUFFICIENCY OF EVIDENCE REGARDING FINANCIAL CRIMES

Castor next argues that the evidence is insufficient to support conviction of the fraud and unauthorized use of a financial transaction device charges. She claims that there is no direct evidence that she signed any check or debit card transaction slip without Brown's authority. She argues that Brown was generous and authorized the transactions in question.

The question, then, is whether the evidence, when viewed in the light most favorable to the State, supports convictions of the financial crimes discussed below. In reviewing this evidence, we must remember that circumstantial evidence is equally probative to direct evidence. *State v. Kula,* 252 Neb. 471, 562 N.W.2d 717 (1997).

Castor was charged with and convicted of four counts of forgery in the second degree in violation of Neb. Rev. Stat. § 28-603(1) (Reissue 1995), which provides:

> Whoever, with intent to deceive or harm, falsely makes, completes, endorses, alters, or utters any written instrument which is or purports to be, or which is calculated to become or to represent if completed, a written instrument which does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status, commits forgery in the second degree.

To sustain a conviction for forgery, it is not sufficient for the State to show that the signature is not that of the party whose name is used, but it must also affirmatively be shown that the signing was made without his or her authority. *State v. Castor,* 257 Neb. 572, 599 N.W.2d 201 (1999). The forgery counts

involve two $2,000 checks, one made payable to Castor and one to Eddy; a check for $194.08 to Phillips 66; and a check for $140 to Self Store It, Inc.

Castor was also charged with and convicted of one count of unauthorized use of a financial transaction device in violation of Neb. Rev. Stat. § 28-620 (Reissue 1995), which provides:

> (1) A person commits the offense of unauthorized use of a financial transaction device if such person uses such device in an automated banking device, to imprint a sales form, or in any other manner:
>
> . . .
>
> (d) When for any reason his or her use of the financial transaction device is unauthorized either by the issuer or by the account holder.

This count involves purchases made at Wal-Mart, Target, and K mart on November 29, 1996, with Brown's debit card, which purchases totaled $163.69.

The evidence shows that Castor indeed signed the checks and the sales slips. Castor admitted to having written the two $2,000 checks and having made the purchases at Wal-Mart. As to the check to Self Store It, Inc., Pam Zilly, a documents examiner for the Nebraska State Patrol Criminalistics Laboratory, testified she found that the check was filled out by Castor and that the signature was an attempted simulation of Brown's signature. As to the check to Phillips 66, Zilly found that the check was filled out by Castor and that the signature was an attempted simulation of Brown's signature, although Zilly could not identify the handwriting on the payee line. Finally, Zilly testified that the signatures on the sales slips from the November 29, 1996, transactions at Wal-Mart, Target, and K mart were attempts to simulate Brown's signature and were not his natural signatures. In addition, the police found a piece of paper containing Brown's actual signature at Brown's house, but with markings indicating that the signature had been traced a few times. A jury could conclude from this testimony that Castor indeed wrote all the checks and made the simulated signatures on the documents in question. Therefore, the issue in all the above-listed counts is whether Brown authorized Castor to engage in the transactions at issue.

The evidence, viewed in the light most favorable to the State, is sufficient to support the convictions. The jury found that Castor, either alone or with Eddy's assistance, murdered Brown on Thanksgiving Day, November 28, 1996. The financial transactions, however, occurred on November 29. If Brown was dead, it is a reasonable inference that he did not authorize the transactions in advance.

Moreover, Castor told Angela Lauby, a close friend and coworker of Castor's, that she hated Brown and that she was living with him because she wanted his money and because he was paying her living expenses. Lauby testified that one day in November 1996, Castor came to work furious because she had opened one of Brown's bank statements and discovered that Brown had a large amount of money in his account but that he would not give her any. She said she needed money to pay her bills, but Brown had "cut her off" from getting his money. Castor also told Lauby that Brown did not know about the existence of the Phillips 66 card.

Mary Sperry, a friend of Brown's, similarly testified that she had a conversation with Castor about a certain checking account Brown had. Castor told Sperry that she could not understand why Brown was so "tight" with his money when he had so much in his accounts. Sperry testified that on one occasion, Castor acted disgusted and said that she (Castor) did not think she should have to pay Brown back for money he loaned her for gas because he had so much money.

Sperry said that she (Sperry) had been a close friend of Brown's for years and that though he was largely illiterate, Brown knew how to write checks. She had never seen Brown allow anyone to write his checks for him, other than his wife, Diane, who died in 1993. Sperry testified that Brown was particular about his money and always said that he had worked hard for his money and that if other people wanted money, they could earn their own. She said Brown would loan people money if he trusted them, but he would not give them money outright. Sperry said it would have been out of character for Brown to have given Castor and Eddy $2,000 each.

An account analyst for Phillips 66 testified that an account was opened with her company in Brown's name on September

17, 1996, and that the billing address was promptly changed to Castor's post office box on September 30. On November 26, the account was past due, so she called Brown. Brown denied ever having opened the account and requested that the account analyst close it. He did not acknowledge having made any payments, despite the fact that a money order dated November 21, 1996, bearing his purported signature, had already been sent to Phillips 66. Later, a check, dated November 29 and written by Castor but bearing a simulation of Brown's signature, was sent to Phillips 66 to pay the remaining balance. The Phillips 66 card was found in Castor's car when it was searched in Nevada.

The evidence shows that Brown became aware of and was upset by Castor's activities. Brown's sister testified that when she called him on Tuesday, November 26, 1996, he seemed agitated. She got the impression that he had been fighting with Castor before the call. Castor made several statements describing Brown as "mad" on November 26 and "mad" or "still mad" on a number of other days during that week. A reasonable jury could infer that Brown was indeed mad that Castor had set up an account without his authorization.

We conclude that the evidence, taken in the light most favorable to the State, is such that a jury could find beyond a reasonable doubt that Brown did not authorize the transactions in question. We therefore affirm Castor's convictions on these counts.

SUFFICIENCY OF EVIDENCE REGARDING MURDER

Castor finally argues that the evidence is insufficient to support her convictions for murder and use of a weapon to commit a felony. She contends that the evidence points to her son Eddy as the murderer. She argues that Eddy had no alibi for the early evening hours of Friday, November 29, 1996, when the Petersens heard the three shots near their farm.

As stated above, in reviewing a criminal conviction, an appellate court will affirm the conviction, absent prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001).

Neb. Rev. Stat. § 28-303 (Reissue 1995) provides: "A person commits murder in the first degree if he kills another person (1) purposely and with deliberate and premeditated malice . . . ."

In discussing the sufficiency of the evidence, we will recount the evidence in the light most favorable to the State.

The State presented evidence that Castor falsely reported a burglary on October 9, 1996, in order to cover up her later use of her .22-caliber Ruger revolver in the murder of Brown. Castor told the police that she thought the burglar somehow gained entry to the house, then exited through a 12-by-12-inch hole the burglar cut in the window of a second-floor bedroom, and then reentered through a similar hole in a screen on Castor's bedroom window. Castor's bedroom had been ransacked, but it was the only room in the house that was in such condition.

The investigating officer said he suspected that the report was false because the only evidence of forced entry consisted in two small holes cut in the window screens in Castor's room and Guider's adjacent bedroom, both of which would have been too small for an adult to pass through. In addition, he also thought it suspicious that someone who was already inside the house would have gone outside the house in broad daylight to break into another room, as opposed to just breaking through the door to the room. There were also valuable items downstairs that were visible and yet were not taken, such as several "long guns," a couple of VCR's, and several televisions.

The State also presented evidence of Castor's possible motive for killing Brown. As stated above, Sperry, a friend of Brown's, testified that at some point in the weeks preceding Brown's murder, she had a conversation with Castor about Brown and his money in which Castor said she was angry with Brown because she knew Brown had a lot of money and was not generous with it.

Also as discussed above, Lauby testified that Castor told her in the weeks before Brown's murder that she (Castor) hated Brown. Castor told Lauby that she came to Kearney only because she needed money and that Brown was going to pay her living expenses. She told Lauby that she was "living off" of Brown and wanted his money. In her conversations with Lauby, Castor usually referred to Brown as "asshole" or "Mr. Asshole." Lauby said Castor was often upset with Brown and would say things like, "I wish that son-of-a-bitch would die."

The evidence shows that Castor also stood to profit from Brown's death. Brown had taken out an $18,000 life insurance

policy which named Castor as the sole beneficiary. A cellmate of Castor's after the murder testified that Castor wondered aloud whether she would still be able to get the money from the life insurance policy.

The State also offered evidence regarding the events of Thanksgiving week 1996 to show circumstantially that Castor had the motive and opportunity to kill Brown and that she did, in fact, kill Brown. As stated above, Brown's sister testified that on Tuesday, November 26, 1996, she called Brown on the telephone. She noticed he was agitated and got the impression that he and Castor had been fighting. This was the same day Brown learned of the Phillips 66 account Castor had opened in his name.

Regarding Thanksgiving Day, it is undisputed that the only people at Brown's house that day were Eddy, Castor, and Brown. The three had dinner in the late afternoon. Eddy testified that when he went to bed, Castor and Brown were sitting in the living room watching television. Eddy also testified that whenever he stayed at Brown's house, he would always wear headphones in bed to drown out the sound of the passing trains. The State's theory is that sometime later that night, as Brown was sleeping on the sofa with his usual blanket in the living room, Castor shot him with her .22-caliber revolver, but that Eddy did not hear it because of his headphones. The blanket was never found. No one, other than Eddy and Castor, claims to have seen Brown alive after Thanksgiving Day.

Eddy and Castor claim that Brown went shopping with them the next day at Brown's suggestion, even though Brown hated shopping. They first went to Wal-Mart, then to Target, then to a bank, and finally to K mart. According to the receipts from the three stores, they made purchases at Wal-Mart at 8:31 a.m., at Target at 9:21 a.m., and at K mart at 11:09 a.m. One of the items they bought at Target was a hinge hasp, which is the locking device that Eddy and Castor later installed on the basement door. At the bank, they deposited two $2,000 checks drawn on Brown's account, one written to Castor and one to Eddy. According to bank records, the deposit occurred at 10:25 a.m.

Castor's version of events is somewhat different than what is reflected by the receipts. She said the three of them went to the three stores first, then to the bank, and then back to Brown's

house. Castor's version also differs from Eddy's in regard to whether Brown was with them at the various stops they made that morning. Castor said that Brown was with them at all stops, whereas Eddy said that Brown accompanied them to Wal-Mart, Target, and the bank, but not to K mart. Castor said that when they arrived back at Brown's house between 10:30 and 11 a.m., Brown got out of the car and said, "I'll be a son of a bitch," and then walked out toward a brown pickup truck with primer on it. Castor and Eddy both said Brown then got into the pickup truck and left, saying he was going to work on another truck. Castor said Brown was still upset when he left.

At some point after Brown's alleged departure, Sperry came to Brown's house to pick up some cigarettes Brown had bought for her in Wyoming. While Sperry was there, Castor told Sperry of her plans to leave with Eddy the next day for Oregon and Nevada. She said that Brown had given her a couple thousand dollars to cover her traveling expenses. Sperry testified, however, that she was a good friend of Brown's and did not know of another occasion where Brown had given Castor money. Indeed, as stated above, she testified that it would have been out of character for Brown to give anyone $2,000. As we concluded above, the evidence is sufficient to show that Castor in fact forged these checks.

The testimony regarding the timing of events during the afternoon of November 29, 1996, is in conflict. It is undisputed that at some point in the afternoon, Eddy and Castor installed the hinge hasp on the basement door. Eddy testified that the purpose was to keep the dogs from getting dirty in the basement. However, he also said that Brown had never asked him to get a hinge hasp, nor had Brown expressed concern over the dogs going downstairs. Thus, although Brown had not requested that a hasp be installed, Castor and Eddy nonetheless installed one, albeit the day before they were to permanently leave town.

While Castor was at work the evening of November 29, 1996, Brown's nephew, Michalski, came to Castor's workplace looking for Brown. He and his family had planned to join Brown for Thanksgiving dinner but were unable to come to Kearney until November 29. They had just been to Brown's house, but no one was home. Castor told him that Brown had been out drinking and left with someone in a brown pickup truck with primer on

it. Michalski and several others, however, testified that Brown had actually given up drinking several years before his death.

Castor got off work early that night around 11:50. Upon arriving home, she began loading her car with items for storage. A neighbor of Brown's testified that she saw Castor's car backed up to the door late that night. Eddy placed a telephone call to Oregon at 12:09 a.m. Castor made several trips to the storage place, finishing around 2:30 or 3 a.m. on Saturday. At that time, she and Eddy then drove to Grand Island, allegedly to pay some insufficient funds checks she had written. She said she did not wait until late that morning because she was worried she would oversleep. Castor and Eddy stayed at a motel for a few hours in Grand Island. They then went to a store and paid the amounts she owed. After paying these, they drove back to Kearney so they could load the cars to leave for Oregon. The State's theory is that Castor and Eddy in fact took Brown's body out and dumped it during the early morning hours that day. They then went to Grand Island and disposed of the murder weapon, Brown's boots, and the blanket on which he had been sleeping when Castor shot him.

Between 7 and 8 a.m. on Saturday, November 30, 1996, Michalski called Brown's house several times, but no one answered. He and his family drove to Brown's house around 9 or 9:30 a.m. When they arrived, Castor and Eddy were there, and Castor's stationwagon was backed up to the front door so they could load it and leave. Michalski helped them load the car. He said that Eddy seemed calm, but Castor was nervous, like she was in a hurry to leave. While Michalski was at Brown's residence, Tom, Jr., called and spoke with Castor. Michalski heard Castor tell Tom, Jr., that she would leave a note for Brown that Tom, Jr., needed some money. Michalski testified that when she hung up the telephone, Castor turned to Eddy and said that she did not know where Tom, Jr., was going to get his money now.

After a few hours of helping Eddy and Castor pack, Michalski and his family left Brown's house, and Eddy and Castor then began their trip to Oregon. Castor had previously planned to leave for Nevada a week later, but she said she decided to leave early because she had heard that a storm was coming and that she was concerned that Eddy had not driven in

ice and snow before. Despite the purported concern about the storm and despite their hurry to leave, they traveled only from Kearney to North Platte that day. The next day (Sunday, December 1, 1996), they traveled to Idaho, and on Monday, they drove to Oregon.

The State presented certain other evidence to support its theory. Dr. Jerry W. Jones, the pathologist who performed the autopsy, testified that in his opinion, the body was moved from somewhere else to the location where it was found. He based this opinion on a number of factors. First, the lividity in the body, which is the settling of the blood after death in the lowest parts of the body, was relatively uniform on Brown's backside from head to heel. Jones testified that this indicates that when the lividity set in, the body was lying on a flat surface. Jones stated that the lividity in the body was not consistent with the incline on which the body was found. Second, the body was inappropriately dressed for that time of year. Brown was wearing no coat and was only wearing a T-shirt. Third, Brown was wearing no shoes, but his socks were not dirty, as they would have been if he had been walking around outside without shoes. Fourth, the sharp upward and downward angles of the bullets are not easily explained if Brown had been upright and alert when he was shot. Instead, they are more easily explained if he was in a supine position. Fifth, Jones found that for the holes in the shirt to match those in the body, the shirt would have to have been shifted over to the right. Jones testified that this would be consistent with what might happen when a person sleeps. Finally, Jones noted that there was not much blood at the scene where the body was found. If Brown had been shot there, there would have been much more blood, because, given that blood was entering the air passages, he would have been coughing up a large amount of blood. Based on these findings, Jones concluded that Brown was shot and killed, possibly while he was sleeping in a supine position, and was later moved to the location where his body was found. Jones also testified that these and other findings he made would be consistent with a time of death somewhere between November 27 and 30, 1996.

A Nebraska State Patrol officer testified that based on the gunshot residues on Brown's shirt, he concluded that the gun was fired from not more than an arm's length away. He also

examined the bullets extracted from Brown's body and testified that while the murder weapon had not been found, the bullets could have been fired from a .22-caliber Ruger revolver like the one Castor owned. An investigator for the Buffalo County Sheriff's Department testified that he searched Castor's car in Reno, Nevada, and found 13 unspent .22-caliber bullets (as well as a Phillips 66 card in Brown's name).

The police were never able to find the murder weapon, Brown's work boots, and the blanket Brown always used when he slept on the sofa. The theory, as stated above, is that Castor and Eddy destroyed these items when they went to Grand Island in the middle of the night on Saturday, November 30, 1996.

The defense attempted to contradict the State's theory by introducing testimony that shots were heard on November 29, 1996, in the vicinity of the scene where Brown's body was found. The State, however, introduced the testimony of Whicker, who conducted tests and determined that the sound of such gunshots, if fired from where the body was found, could not have been heard at the place where the Petersens said they heard shots.

We conclude that the evidence regarding the first degree murder charge is sufficient that a jury could find beyond reasonable doubt that Castor is guilty of the charge. The evidence, viewed in the light most favorable to the State, shows that Castor hated Brown and tolerated him only because she needed his money. When he "cut her off," her reason for tolerating him ceased. Indeed, given that Castor stood to benefit from Brown's life insurance policy, Brown became worth more to her dead than alive. Castor also had the opportunity to kill Brown, being alone with him Thanksgiving evening. The inconsistencies between Eddy's and Castor's accounts of the events of the next day, as well as their strange actions culminating in their trip to Oregon, also lend weight to the State's case. Perhaps most damning of all is her statement, after ending her telephone conversation with Tom, Jr., that she wondered where he would get his money now. We conclude that Castor's assignment of error regarding this issue is without merit.

In regard to the charge for use of a weapon to commit a felony, we find the evidence sufficient that a jury could find beyond reasonable doubt that Castor committed the crime.

Because the evidence is sufficient to support her murder conviction and because Brown was murdered with a gun, it follows that the evidence is sufficient to support her conviction of use of a weapon to commit a felony.

## CONCLUSION

We, therefore, conclude that the trial court did not err in excluding Downey's testimony. We further conclude that the evidence is sufficient that a jury could find beyond a reasonable doubt that Castor is guilty of all counts charged.

AFFIRMED.