IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MOSS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

NICHOLAS M. MOSS, APPELLANT.

Filed June 5, 2018.    No. A-17-733.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Gregory A. Pivovar for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Nicholas M. Moss appeals his convictions and sentences in the Sarpy County District Court for first degree sexual assault, first degree false imprisonment, and violation of a domestic violence protection order. We find that the record is insufficient on direct appeal to address several of Moss' ineffective assistance of counsel claims. Finding no merit to the remaining arguments raised on appeal, we affirm.

## II. BACKGROUND

Moss and K.E. were in a dating relationship for approximately 3 years. In April 2015, an incident occurred that prompted K.E. to apply for a domestic violence protection order against Moss. The protection order was issued on May 3, and Moss was served with the protection order while he was incarcerated. Moss was released on May 14, and the events at issue in this case,

which will be described in detail below, occurred later that evening into the early morning of May 15.

As a result of the May 14 and 15, 2015, events, Moss was arrested and charged with first degree sexual assault, first degree false imprisonment, and violation of a domestic violence protection order. At the time Moss was arrested, police seized a black cell phone from his pants' pocket. At a pretrial hearing on a discovery motion held on January 4, 2016, Moss clarified that, in addition to other evidence, he was seeking any cell phones in the possession of the police. The district court explained that the State could give him a listing of the property in its possession or he could file a specific motion seeking to have the cell phone examined by an independent expert, but the State "can't simply turn over the cell phone to you."

Numerous additional hearings were held regarding Moss' cell phone. The State continued to utilize its available resources to bypass the personal identification number (PIN) code requirement on the phone to access any information that may be stored on the phone which would be relevant to this case. Moss indicated a general belief that the phone might contain exculpatory evidence and wanted updates from the State as to the status of its inspection. At various hearings, the district court reminded Moss that he could file a motion to have an independent expert examine the phone, and the State had no objection to his doing so. Ultimately, he never filed such motion.

The State was unable to successfully bypass the PIN code requirement on Moss' cell phone and approved utilization of a "chip off" procedure, which was described as a last option to gain access to the information stored on a cell phone. Through this procedure, the memory chip is removed from the motherboard of a cell phone and placed in a reader to access the data directly from the chip. Utilizing this procedure almost certainly results in the destruction of the phone. At that point, however, that particular procedure is the only remaining option to attempt to read the chip, which is the part of the phone that contains any data or information that may be useful.

The State utilized the chip off procedure for Moss' phone, but because the type of phone Moss had is rare in this part of the country, no local law enforcement agencies had a reader that could read its chip. Thus, the chip was shipped to an out of state facility, which was also unable to read the data from the chip. The State therefore determined that it would not be able to utilize any information from the phone at trial, and the phone was returned to Moss in several pieces.

Moss filed a motion to dismiss the charges on June 6, 2016. He noted that when the cell phone was returned to him, it was broken into pieces and he claimed that when the State determined it was unable to access the information on the phone, it intentionally destroyed the phone to prevent Moss from accessing it. He asserted that as a result, his due process rights had been violated and requested that the court dismiss the charges.

An evidentiary hearing was held on the motion to dismiss, and two forensic technology experts testified for the State as to the process they used on Moss' phone. They explained that because they did not have the PIN code to the phone, they had to attempt to bypass the code requirement, but were unable to do so using their available technology. Thus, as a last effort, they utilized the chip off procedure, a procedure which they have used in the past and which is an accepted procedure in the scientific community. They acknowledged that using this procedure generally destroys the phone.

The district court subsequently issued an order concluding that the State had not acted in bad faith in failing to preserve the cell phone. It observed that law enforcement utilized all available means in order to gain access to the phone prior to utilizing the chip off procedure. The court noted that Moss, through counsel, could have provided the PIN code to the phone which would have allowed the State to examine its contents and discover any information of evidentiary value, inculpatory or exculpatory. The court also determined that although Moss' counsel made general statements about the phone possibly containing exculpatory evidence, there was never an indication as to what that evidence was or its value to Moss. Accordingly, the motion to dismiss was denied.

Trial was held over the course of several days in January 2017. K.E. testified that Moss was her former boyfriend and that during their relationship, they bought a pet dog. She explained that she obtained a protection order against Moss, which was issued on May 3, 2015, but when he was released from jail on May 14, he called her repeatedly. She told him not to call her anymore and that their relationship was over.

Around 7 pm that evening, K.E. went to the home she had previously shared with Moss. She observed that a glass door was broken and their dog was missing. She called 911, and while she was waiting for the police to arrive, Moss called. K.E. asked about the dog, and he said it was fine but threatened that if she wanted to see the dog again, she had to meet with him that night. K.E. decided to meet with Moss in order to get her dog back. She ultimately met him in a grocery store parking lot and got into his vehicle.

They drove around and made several stops, including at a few bars and at an extended stay hotel where Moss had been residing since his release from incarceration. K.E. testified that throughout the evening, Moss was making threats against the dog and K.E.'s family. Eventually they went to the apartment of Moss' friend, Chris Pham. The dog was at the apartment, and K.E. was relieved to see her dog. After leaving the apartment, they drove around for a while and then returned to the hotel for the second time. At that point, K.E. was feeling distraught, confused, and a little hopeless because she thought once she got to see the dog, the night would be over.

Moss and K.E. went into Moss' hotel room, and K.E. asked if she could leave. She moved toward the door, but Moss got in front of her. He locked the door, pulled her back by the arm, and said she was staying there and not going anywhere. K.E. explained that prior to this point in the evening, she felt as though she could handle the situation, but at the point when Moss prevented her from leaving the hotel room, she no longer felt in control and began to believe that there was "no coming back."

When Moss went to use the restroom, K.E. dialed 911 from the hotel phone and left the phone off the receiver. She was unsure whether the call was successfully completed but did not have time to check before Moss exited the restroom. But she hoped that someone would hear them through the phone and send someone to the room to check on her. A hotel employee confirmed that a 911 call had been placed from Moss' room that evening. Moss had left the door to the restroom partially open, and K.E. would have had to walk past the restroom in order to get to the door of the room. K.E. explained that she was scared for herself at that point because Moss would not let her leave and had "strong-armed" her. Moss had his cell phone and her cell phone on his person.

A short while later, Moss asked K.E. why they could not "just make love for one last time." She told him she did not want to, but he forcibly pulled her jeans off and penetrated her vagina with his penis. She continued to resist, but he put his hands around her throat and over her mouth. He pulled out of her and penetrated her again, at which point she was crying "a lot" and he stopped.

Afterwards, K.E. repeatedly pleaded with Moss to take her to get her dog or return her back to her vehicle, and he finally agreed. He did not drive straight to her vehicle, but instead drove around for "what seemed like an eternity." While driving Moss made comments to K.E. about how he could fix their relationship and said they would both be better off if they were dead. Moss suggested that he wanted to end their lives by crashing the vehicle. At that point, K.E. decided to attempt to jump out of the vehicle. When they stopped at a red light, K.E. opened the door, started screaming for help, and jumped out.

Two nearby drivers stopped to help K.E. and called the police. K.E. reported to the officer that Moss had held her against her will and sexually assaulted her. The officer transported K.E. to a hospital where she underwent a sexual assault examination.

During the examination, K.E. told the nurse that she had met with her former boyfriend, and they went to a hotel. K.E. said that Moss had indicated to her that he wanted to have sex with her one more time, she refused, but he penetrated her anyway. The sexual assault examination revealed Moss' sperm inside K.E.'s vagina.

Moss testified in his own defense at trial. He alleged that contrary to K.E.'s testimony, she willingly accompanied him on May 14 and 15, 2015. He denied ever threatening their dog or K.E.'s family. He testified that while at a bar, K.E. asked him if he wanted to have sex. He claimed that they then went to the hotel and had consensual sex. He acknowledged arguing with her in his vehicle the following morning, but he claimed it was because she was still intoxicated. When she opened the door to the vehicle, he said he pulled her back in because he thought she was falling out.

After the conclusion of evidence, the jury found Moss guilty of all three charges. He filed a motion for new trial, which was denied. Moss was sentenced to 20 to 25 years' imprisonment for sexual assault, 5 to 5 years' imprisonment for false imprisonment, and 1 to 1 year's imprisonment for violating the protection order. The sentences were ordered to be served consecutively. He now appeals to this court.

## III. ASSIGNMENTS OF ERROR

Moss assigns that the district court erred in (1) failing to grant his motion for discharge for denial of his rights to a speedy trial, (2) failing to grant his motion to dismiss for destruction of evidence, (3) failing to grant a mistrial or admonish the jury due to the shocking of him by a "stun belt," (4) failing to grant a directed verdict and finding sufficient evidence to support the jury verdicts, and (5) failing to grant probation and imposing excessive sentences. He also assigns that he received ineffective assistance of trial counsel in several respects.

## IV. ANALYSIS

### 1. MOTION FOR DISCHARGE

Moss assigns that the district court erred in denying his motion for absolute discharge due to a violation of his right to a speedy trial. Prior to trial, Moss filed a motion for discharge claiming that his statutory and constitutional rights to a speedy trial had been violated. In an order dated October 20, 2016, the district court denied the motion on both grounds. No appeal was taken from that order.

The State now argues that we lack jurisdiction over this issue because Moss did not appeal from the denial of his motion to discharge. We agree with the State with respect to Moss' statutory right to speedy trial. A ruling on a motion for absolute discharge based upon an accused criminal's nonfrivolous claim that his or her statutory speedy trial rights were violated is final and appealable. See *State v. Williams*, 277 Neb. 133, 761 N.W.2d 514 (2009). Therefore, an appellate court lacks jurisdiction to adjudicate a statutory speedy trial issue in a direct appeal where the defendant has not appealed within 30 days of the pretrial ruling denying a motion for discharge. See *id*. Moss did not appeal within 30 days of the district court's October 20, 2016, order, and thus, this court lacks jurisdiction over his statutory speedy trial claim.

We note that Moss' motion for discharge alleged that there had been a violation of both his statutory and constitutional rights to speedy trial, and the district court addressed the motion on both grounds. On appeal, Moss assigns error on both bases, but argues only that the motion should have been granted based on a violation of his statutory right to speedy trial. We therefore do not address whether the district court erred in denying his motion on constitutional grounds. See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

### 2. MOTION TO DISMISS FOR DESTRUCTION OF EVIDENCE

Moss claims that the district court erred in denying his motion to dismiss because his right to due process was violated by the State's destruction of his cell phone. He first argues that the information contained on the cell phone should have been classified as material evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), rather than potentially exculpatory evidence, which is subject to a bad faith analysis pursuant to *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). In the alternative, he asserts that even if the information was properly considered to be potentially exculpatory evidence, the bad faith standard was satisfied when the State destroyed the cell phone, particularly without ever asking Moss for the PIN code for the phone. We find no merit to his arguments.

Under *Brady v. Maryland, supra*, suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment. See *State v. McGee*, 282 Neb. 387, 803 N.W.2d 497 (2011). Favorable evidence is material, and constitutional error results from its suppression by the State, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* The Due Process Clause of the 14th Amendment, as interpreted in *Brady v. Maryland,*

*supra*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. *Arizona v. Youngblood, supra*.

But the Due Process Clause requires a different result when dealing with the State's failure to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. *Arizona v. Youngblood, supra*. Therefore, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. *Id*. See, also, *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *Arizona v. Youngblood, supra*; *State v. Castor, supra*. A trial court's conclusion that the government did not act in bad faith in destroying potentially useful evidence, so as to deny the defendant due process, is reviewed for clear error. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

In the present case, the district court determined that the information contained on the cell phone was potentially exculpatory evidence, and that the State did not act in bad faith in destroying the phone. This determination is not clearly erroneous.

We understand Moss' argument to be that had the phone not been destroyed, he could have input the PIN code and located evidence that could potentially assist his defense. In other words, had the phone not been destroyed, no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Moss also relies on the fact that the State apparently obtained a search warrant for his cell phone as evidence that the information contained on the phone was material. We do not agree; the State repeatedly explained that the purpose of searching the cell phone was to determine what information it contained and whether any of that information was relevant to this case. Accordingly, the cell phone was properly categorized as potentially exculpatory evidence rather than material evidence. Therefore, whether Moss' due process rights were violated depends upon whether the State acted in bad faith.

The record before us demonstrates that the district court's conclusion that there was no bad faith on the part of the police is not clearly erroneous. As iterated above, the presence or absence of bad faith by the police turns on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); *State v. Castor, supra*. At the time the chip off procedure was performed here, neither the prosecutor nor the law enforcement officers who physically examined Moss' cell phone knew what relevant information, if any, could be found on the phone. The purpose of utilizing the chip off procedure was an attempt to access the data on the phone and determine if any of it was pertinent to this case. Thus, at the time the chip off procedure was performed, the police had no knowledge of the exculpatory value of any information contained on the phone.

Moss also repeatedly points out that the State never asked him for the PIN code to the phone, and argues that had it done so, he would have gladly provided that information because he, too, wanted the information on the phone to be accessed. In conjunction with this argument, Moss also notes the prosecutor's comment at a hearing regarding the cell phone that Moss "will not be getting any cell phones as far as I am concerned." He claims that this comment combined with the fact that the State never asked him for the PIN code establish that the State acted in bad faith.

We first observe that the prosecutor's comment was made at the January 4, 2016, hearing in response to Moss' request for the phone to be released to him personally, rather than allowing it to be examined by an expert of his choosing. After the State's comment that Moss would not be getting the phone, the district court explained to Moss' counsel that the State "can't simply turn over the cell phone to you." There was a discussion with the court indicating that Moss could file a motion requesting to have an independent expert analyze the cell phone, but Moss' argument appeared to center around his request for the State to physically give him the phone. The State never objected to providing the cell phone to an independent expert for analysis; in fact, the State specifically agreed to release the phone to an expert of Moss' choosing for examination but objected to releasing the phone to Moss himself.

Moss cites to no authority which would allow the district court to authorize the release of a piece of physical evidence to the defendant directly, and we have found none. And we do not interpret the State's comment as a refusal to allow the phone to be inspected by someone other than a law enforcement officer selected by the State. Instead, the State objected to giving the phone to Moss because he knew the PIN code and could potentially erase or change information stored on the phone. Although the State was ultimately unable to gain access to any information on the cell phone, its objection to allowing Moss to personally have access to the phone was not unreasonable or in bad faith.

Further, Moss repeatedly notes that no one asked him for the PIN code for the cell phone, which he claims he would have provided. He again provides no authority that the State was required to ask him for the code, and as the State observed at one hearing on this issue, it could not require him to provide that information. In addition, Moss was present during numerous hearings where the State described its attempts at bypassing the PIN code requirement on Moss' cell phone. If Moss was as interested in accessing the information on the phone as he now claims he was, he was aware that the PIN code could assist in unlocking the phone and could have offered to provide it.

Having found that the district court's determination that the State did not act in bad faith is not clearly erroneous, we conclude that the court did not err in denying the motion to dismiss.

3. MISTRIAL OR ADMONISHMENT OF JURY

Moss argues that the district court erred in not finding plain error and granting either a mistrial or a limiting instruction after he was shocked by a "stun belt" during trial. The record contains little information on this issue. However, during the testimony of a law enforcement officer at trial, the record indicates the following:

> (Defendant yelled.)
> DEPUTY: You all right?
> THE COURT: Can you continue with your answer, sir? Do we need to take a short break?
> THE DEFENDANT: Can we please? Sorry, my back.

The court then excused the jury and took a break. The court came back on the record and explained that there had been a noise and Moss yelled, "realizing that the bandit had went off." The sheriff's

deputy indicated that he did not activate the bandit. The "bandit" is an electronic restraint device that Moss was wearing on his leg during trial. Although the record is unclear as to exactly what occurred, the device apparently delivered some type of shock to Moss during trial.

Recognizing that defense counsel made no motion for a mistrial or a request for a limiting instruction, Moss claims it was plain error for the court not to order either sua sponte. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014).

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Mitchell*, 294 Neb. 832, 884 N.W.2d 730 (2016). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id*. Moss has not made any argument nor pointed to any evidence that he was prejudiced by the activation of the device. As a result, we conclude that the district court did not plainly err in failing to order a mistrial.

Likewise, Moss claims the district court should have given a limiting instruction; however, we assume he means a curative instruction. The Nebraska Supreme Court has held that a party who does not request a desired jury instruction cannot complain on appeal about incomplete instructions. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998) (finding no error in court's failure to provide curative instruction absent request to do so). Based upon the absence of any prejudice as set forth above, we find no plain error in the court's failure to sua sponte give a curative instruction.

### 4. MOTION FOR DIRECTED VERDICT AND SUFFICIENCY OF EVIDENCE

Moss contends that the district court erred in denying his motion for directed verdict and finding sufficient evidence to support the verdicts. We find no merit to these arguments.

At the close of the State's evidence, rather than moving for a directed verdict, Moss made an oral motion to dismiss. This motion could be considered the equivalent of a motion for directed verdict, but in arguing his motion, Moss referred back to the incident involving the electronic device, and not the sufficiency of the evidence. The State responded to the motion on the grounds Moss asserted but also as to whether the State presented prima facie evidence to support the charges. And the district court concluded that a prima facie case had been made. Thus, the record is unclear as to whether Moss' motion to dismiss at the close of the State's evidence was intended to be a motion for directed verdict based upon the State's alleged failure to present a prima facie case.

Assuming Moss' motion was a motion for directed verdict, he has waived any challenge to the denial of his motion because he presented evidence after the motion was denied. In a criminal trial, after a court overrules a defendant's motion for a dismissal or a directed verdict, the defendant waives any right to challenge the trial court's ruling if the defendant proceeds with trial and introduces evidence, but the defendant may challenge the sufficiency of the evidence for the convictions. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). Accordingly, to the extent

Moss made a motion for a directed verdict at the close of the State's case-in-chief, a challenge to the denial of that motion has been waived. We will, however, address his argument that the evidence was insufficient to sustain the convictions.

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Pertinent to the present case, first degree sexual assault occurs when any person subjects another person to sexual penetration without the consent of the victim. Neb. Rev. Stat. § 28-319 (Reissue 2016). Sexual penetration includes sexual intercourse in its ordinary meaning. Neb. Rev. Stat. § 28-318 (Reissue 2016). Without consent means the victim was compelled to submit due to the use of force or threat of force or coercion; or the victim expressed a lack of consent through words; or the victim expressed a lack of consent through conduct; or the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor. *Id.* The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent. *Id.*

K.E. explained that the second time she and Moss went to the hotel, he refused to allow her to leave and indicated his desire to engage in sex with her. She told him that she did not want to, but he persisted. K.E. testified that she said, "'No. Stop. I don't want to do this.'" Despite her protests, Moss forcibly removed her jeans and straddled her while she was crying and asking him not to do what he was doing. According to K.E., Moss then penetrated her, and when he did so, she let out a "gasp" or "shriek," and Moss put his hands around her throat and over her mouth. Moss' account of the events at the hotel differed from K.E.'s, claiming that she suggested having sex and consented to it; however, in convicting Moss, the jury necessarily determined that K.E. was more credible than Moss, and we do not pass on the credibility of witnesses or reweigh the evidence. K.E.'s testimony is sufficient to show beyond a reasonable doubt that Moss subjected her to sexual penetration without her consent.

Moss also argues that during his relationship with K.E., they engaged in role playing and "rough sex" and had a code word they used to indicate when activity should cease. He claims that during the incident in question, K.E. never used their code word to indicate that she wanted him to stop sexual activity. K.E. acknowledged that she had engaged in role playing with Moss during their relationship and that they had a code word. She explained that she did not use the code word during this incident because "this was not role playing, period." As iterated above, an appellate court does not reweigh the evidence or assess the credibility of a witness. *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015). When viewing the evidence in the light most favorable to the State, we find that the evidence is sufficient to support the conviction for first degree sexual assault.

Moss was also convicted of first degree false imprisonment. As relevant to this case, a person commits first degree false imprisonment if he or she knowingly restrains or abducts another

person under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury. Neb. Rev. Stat. § 28-314 (Reissue 2016). Restrain means to restrict a person's movement in such a manner as to interfere substantially with his liberty by means of force, threat, or deception. Neb. Rev. Stat. § 28-312 (Reissue 2016).

The jury in the present case was instructed, without objection from Moss, on the definition of terrorizing circumstances as provided in *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998). The jury was instructed that terrorizing circumstances mean circumstances in which one is filled with terror or scared and that terrorizing is a synonym for frightening, which means to markedly disturb with fear, throw into a state of alarm, make afraid, or terrify. See *id.* Thus, the evidence must demonstrate that Moss knowingly restricted K.E.'s movement by interfering substantially with her liberty by means of force, threat, or deception under circumstances which made K.E. afraid or terrified.

K.E. explained that at first on the evening of May 14, 2015, she willingly agreed to meet Moss and got into his vehicle in an attempt to calm him down so she could get her dog back. She said that she felt as though she had control of the situation until the second time they went to the hotel. There, they went into the room and K.E. asked if she could leave. When she moved towards the door, Moss got in front of her and said, "Where do you think you're going? You're not going anywhere." He then locked the door, pulled her back by the arm, and said she was staying there and not going anywhere. When Moss went to use the restroom, K.E. dialed 911 from the hotel phone because she was scared for herself at that point. She was too afraid to attempt to leave because Moss left the restroom door partially open, and K.E. would have had to walk past the restroom in order to reach the door.

Shortly thereafter, Moss broached the topic of having sex, and K.E. declined. He then sexually assaulted her as explained above. Afterwards, K.E. continually pleaded with Moss to return her back to her vehicle, and he finally agreed but instead he drove around for "an eternity." While driving Moss said they would both be better off if they were dead and suggested wanting to end their lives by crashing the vehicle. Ultimately, K.E. escaped by jumping out of the car. This evidence is sufficient to conclude that Moss knowingly restricted K.E.'s movement by force or threat under circumstances that terrified K.E.

Finally, Moss concedes that he violated a protection order. Brief for appellant at 26. Therefore, we need not address the sufficiency of the evidence as to that offense. Finding that the evidence was sufficient to support all three offenses, we conclude that this assignment of error lacks merit.

### 5. Excessive Sentence

Moss asserts that the district court erred in withholding probation and imposing excessive sentences. We find no abuse of discretion in the sentences imposed.

Moss was convicted of first degree sexual assault, first degree false imprisonment, and violation of a domestic abuse protection order. First degree sexual assault is a Class II felony. § 28-319. Class II felonies carry a punishment of 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Supp. 2017). Moss was sentenced to 20 to 25 years' imprisonment.

First degree false imprisonment is a Class IIIA felony. § 28-314. At the time of Moss' offense, a Class IIIA felony was punishable by up to 5 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Moss received a sentence of 5 to 5 years' imprisonment.

Violation of a domestic abuse protection order is a Class I misdemeanor and punishable by not more than 1 year's imprisonment. Neb. Rev. Stat. §§ 42-924 (Supp. 2017) and 28-106 (Reissue 2016). Moss' sentence was 1 to 1 year's imprisonment. Thus, all of Moss' sentences come within the statutory limits.

Nevertheless, Moss claims that the district court should have imposed probation rather than a sentence of incarceration. He argues that the district court failed to consider the factors set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2008), and had it done so, it should have imposed probation because he "was not only a good candidate for probation, but an excellent candidate for probation." Brief for appellant at 48. He claims that not a single factor contained in § 29-2260 weighs in favor of incarceration.

Whether probation or incarceration is ordered is a choice within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v. Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. As was the case in *State v. Cerritos-Valdez*, all of Moss' offenses occurred prior to August 30, 2015, and therefore, our analysis is unaffected by 2015 Neb. Laws, L.B. 605.

It has long been the rule that when imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *State v. Cerritos-Valdez, supra*.

Additionally, when deciding if it is appropriate to withhold a sentence of imprisonment and grant probation, a sentencing court is guided by the statutory grounds set forth in § 29-2260(3):

> The following grounds, while not controlling the discretion of the court, shall be accorded weight in favor of withholding sentence of imprisonment:
>
> > (a) The crime neither caused nor threatened serious harm;
> >
> > (b) The offender did not contemplate that his or her crime would cause or threaten serious harm;
> >
> > (c) The offender acted under strong provocation;
> >
> > (d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;
> >
> > (e) The victim of the crime induced or facilitated commission of the crime;
> >
> > (f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;
> >
> > (g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;
> >
> > (h) The crime was the result of circumstances unlikely to recur;

(i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

(j) The offender is likely to respond affirmatively to probationary treatment; and

(k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

Section 29-2260(2) further provides that sentencing courts may withhold imprisonment and impose probation

unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because:

(a) The risk is substantial that during the period of probation the offender will engage in additional criminal conduct;

(b) The offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or

(c) A lesser sentence would depreciate the seriousness of the offender's crime or promote disrespect for law.

At the sentencing hearing, the district court made clear that it considered the statutorily required factors and the information contained in the presentence investigation report. The court concluded that imprisonment was necessary for the protection of the public because the risk was substantial that Moss would engage in additional criminal conduct if placed on probation and a lesser sentence would depreciate the seriousness of the offense or promote disrespect for the law. Despite Moss' arguments to the contrary, several of the § 29-2260(3) factors weigh in favor of imprisonment. At a minimum, sexually assaulting and falsely imprisoning K.E. threatened serious harm to her, there was no provocation or justification for Moss' actions, K.E. in no way induced or facilitated the commission of the crimes, Moss has a history of criminal activity including a pending charge when the present offenses occurred, and Moss has no dependents so imprisonment would not entail excessive hardship.

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017). At sentencing, the court specifically noted Moss' criminal history. In 2003, Moss was convicted of trafficking a controlled substance in Nevada and sentenced to 2 to 5 years' imprisonment. In 2006, he was convicted of several charges including possession of methamphetamine, possession with intent to deliver, and being an ex-felon in possession of a firearm. He was sentenced to 10 to 25 years' imprisonment and 50 months' probation. He ultimately violated his probation when he was convicted in 2009 of eluding police and driving under the influence and was sent back to prison for 6 months. Additionally, at the time of the present offenses, Moss had a pending charge of domestic assault for allegedly assaulting K.E., the precipitating event to her obtaining the protection order against him.

In the presentence investigation interview, Moss claimed that the domestic assault charge was the result of a false report, similar to his defense to the present offenses. Although he has repeatedly asserted that he accepts responsibility for his actions, he continues to blame K.E. and deny any wrongdoing.

There is no indication that the sentencing court failed to consider the appropriate factors or considered irrelevant factors. In addition, Moss made many of the same arguments he asserts here during allocution at sentencing. Based on the record before us, we cannot find that the decision to withhold probation and impose a total sentence of 26 to 31 years' imprisonment constitutes an abuse of discretion. We therefore affirm the sentences imposed.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

Moss is represented on direct appeal by different counsel than the counsel who represented him at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief will recognize whether the claim was brought before the appellate court. *Id*.

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

To establish a right to postconviction relief because of counsel's ineffective assistance, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Schwaderer, supra*. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id*.

Moss asserts that his trial counsel was ineffective in 10 respects. We address each claim individually.

### (a) "Stun Belt" Incident

Moss asserts that trial counsel's performance was deficient when he failed to request a jury instruction or admonishment or move for mistrial after he was shocked with the electronic device during trial. We conclude that the record on direct appeal is insufficient to address this claim because, to the extent it supports a conclusion that trial counsel elected to move for a dismissal based on the incident at the close of the State's evidence, it does not explain why trial counsel chose to do so rather than move for a mistrial or instruction to the jury.

Moss also argues, in the context of the electronic device, that trial counsel was ineffective in failing to object to Moss being required to wear it during trial. The record before us lacks any detail regarding use of the electronic device. It is therefore also insufficient to address this claim.

### (b) Testimony of Jennifer York

Moss alleges that his trial counsel was ineffective in failing to offer, in support of his motion to dismiss, the testimony of Jennifer York that there were many other ways for the State to have accessed the information on Moss' cell phone which would not have resulted in destruction of the phone.

An affidavit from York was received into evidence at the hearing on Moss' motion to dismiss based on the destruction of his cell phone. In the affidavit, York explained that she is the company supervisor for a cell phone repair company in Papillion, Nebraska and is a certified micro solder technician. Moss' trial counsel apparently took Moss' cell phone to York for inspection after it had been returned from the State. York determined that the phone had been damaged beyond repair and opined on the quality of work of the person who removed the chip.

Two law enforcement officers also testified at the hearing that they utilize the chip off procedure as a final effort to obtain information from a cell phone when there are no other options. They explained that the Bellevue Police Department has several available methods to attempt to bypass the PIN code on a cell phone, and none of those methods worked on Moss' phone. A digital forensic examiner for the Nebraska State Patrol examined Moss' phone and determined that the only remaining option to attempt to retrieve the information from the phone was the chip off procedure. Thus, even if York had testified that alternative options existed to access the data on Moss' phone, she would not be able to opine as to whether the State's experts had those options available to them. According to the State's forensic experts, they had no alternatives available because they both described the chip off procedure as their last remaining option. As the district court suggested, Moss could have filed a motion requesting that an independent expert examine his cell phone, but he never did so.

Further, as we determined above, the State did not act in bad faith in approving the chip off procedure, because at the time the State attempted the chip off procedure, it was unaware what information was stored on the phone and whether it contained anything relevant to the case. York's testimony as to other available options for accessing data on the phone would not change this outcome. We therefore conclude that trial counsel was not ineffective in failing to adduce this testimony.

### (c) Meaningful Defense

Moss contends that trial counsel was ineffective in failing to provide a meaningful defense. Specifically, he relies on counsel's failure to successfully offer Moss' cell phone records into evidence at trial and his failure to properly subpoena and identify two witnesses. Because these claims are asserted more specifically below, we address them therein.

### (d) Cell Phone Records

Moss claims that trial counsel was ineffective in failing to successfully gain admittance of his cell phone records into evidence at trial. During Moss' testimony, trial counsel offered into evidence cell phone records which would purportedly establish that K.E. had lengthy phone conversations with Moss after the May 14 and 15, 2015, incident, contrary to her testimony at trial. However, the court sustained the State's foundational and hearsay objections because Moss did not have a witness from the cell phone carrier present to lay proper foundation for the exhibit. Moss argues that this evidence would have damaged K.E.'s credibility. We conclude that the record on direct appeal is insufficient to resolve this claim.

### (e) Exculpatory Nature of Evidence From Cell Phone

Moss asserts that trial counsel was ineffective in failing to attach an affidavit to any motion which would establish the "absolute need" for Moss' cell phone and for the information on the cell phone to be maintained and not destroyed. Brief for appellant at 41. Moss claims that the State destroyed the cell phone, and trial counsel's failure to clearly state the phone's true evidentiary value is one of the reasons it was destroyed.

We conclude that the record affirmatively refutes this claim. The court held multiple hearings to discuss the cell phone. The State updated the court and Moss as to its attempts to access the information stored on the phone, and trial counsel made clear that it, too, wanted the information to be discovered. It was no secret that Moss believed there to be potentially exculpatory information on the phone, and an affidavit from trial counsel to that effect would not have changed the outcome. The State utilized its only available methods to bypass the PIN code on the phone, and unfortunately, the chip off procedure, which was used as a last resort, destroyed the cell phone, and the State could not locate a chip reader in order to access the data from the chip. Thus, the importance of the cell phone was made clear, and an affidavit to that effect would not have affected the outcome of this issue or resulted in preservation of the phone. We therefore find no merit to this claim.

### (f) Failure to Disclose Witness Pursuant to Discovery Order

Moss argues that trial counsel was ineffective in failing to disclose a potential witness named Austin Arterburn. Trial counsel attempted to call Arterburn as a witness at trial, but the district court sustained the State's objection to his testimony, because Arterburn had not been disclosed pursuant to a discovery order as a potential witness. Moss later made an offer of proof at which Arterburn explained the testimony he would have offered at trial. Moss claims that Arterburn's testimony would have supported his theory that K.E. falsified the allegations against him in a conspiracy with Pham to keep Moss incarcerated so they could sell his property and keep the profits. We conclude that the record on direct appeal is insufficient to address this claim.

### (g) Service of Out of State Witness

Moss claims that trial counsel was ineffective in failing to properly serve an out of state witness. He argues that Peter Pollard was present at Pham's apartment the night of the incident, which would rebut K.E.'s testimony that there was no one present besides her, Moss, and Pham.

Moss alleges that Pollard would have testified that at no time did K.E. claim that she was in any kind of distress, she did not appear restrained at all, and she never attempted to leave. He claims that this evidence establishes that the events of that evening were "far from false imprisonment" and "not indicative of forcible sexual assault." Brief for appellant at 43.

The potential testimony of Pollard mirrors the testimony of K.E., except that she did not recall seeing anyone else present at Pham's apartment. Regardless, K.E. admitted that she willingly went with Moss to Pham's apartment so she could see her dog, that they spent time hanging out at the apartment, and that she never tried to escape or ask for help while she was there because at that time, she still believed she was not in danger and was in control of the situation. She explained that she originally went along with Moss because she wanted to see her dog and get it back. It was not until they returned to the hotel after leaving Pham's apartment did K.E. begin to feel scared and then the false imprisonment and sexual assault occurred. Thus, Pollard's testimony would have been cumulative of K.E.'s, and we cannot find that it would have impacted the outcome of the proceedings. Accordingly, this claim lacks merit.

(h) Prosecutor as Witness

Moss alleges that his trial counsel was ineffective in failing to call the prosecutor as a witness to testify at the hearing on his motion to dismiss in order to make a record as to the number of times she had an opportunity to request the PIN code to Moss' cell phone but never did so in writing. Moss asserts that he was unaware of the fact that the PIN was needed.

The record affirmatively refutes Moss' claim that he was unaware of the need for the PIN code. The State repeatedly made clear at various hearings the processes it was utilizing in an attempt to bypass the PIN code requirement on Moss' phone. Specifically, at a hearing on March 14, 2016, at which Moss was personally present, the State informed the court that the cell phone had been sent to Lincoln, Nebraska because the State's forensic experts could not open the phone due to it having a specific PIN code.

Additionally, the phone was Moss' personal cell phone. He knew it was protected with a PIN code, a PIN code of his own choosing, and that the State did not have the PIN code. He knew that the State was attempting to access the information stored on the cell phone, so he cannot now claim that he was unaware that his providing the PIN code to the phone would have assisted in gaining access to the information on the phone. The State was under no obligation to request the PIN code from him, as he was under no obligation to provide it. As such, calling the prosecutor as a witness in order to gain her testimony that she had the opportunity to request the PIN code from Moss but did not do so would not have affected the outcome. Moss claims that he would have provided the PIN code had it been requested of him, but the record establishes his knowledge that the PIN code would have been helpful and his failure to provide it. Thus, the State utilized the technology available to it in order to bypass the PIN requirement. The prosecutor's assertion that she could have asked Moss for the PIN code but did not would not have impacted the outcome. Accordingly, this claim has no merit.

### (i) Withdraw and Testify at Hearing on Motion to Dismiss

Moss contends that trial counsel was ineffective in failing to withdraw from representing him and testify at the hearing on the motion to dismiss that the prosecutor never requested the PIN code to the cell phone as she claimed that she had. Similar to the previous claim, this testimony from trial counsel would have had no impact on the outcome of the proceedings. The State was under no obligation to request the PIN code and Moss was not required to provide it. Whether the State requested the PIN code or not, it was not provided, leaving the chip off procedure as the only remaining option for the State. Trial counsel's testimony as to a lack of request would not change the State's use of the chip off procedure, nor would it impact the finding that the State did not act in bad faith. We therefore find no merit to this claim.

### (j) Offer of Proof Regarding Witnesses' Testimony

Moss argues that his trial counsel was ineffective in failing to make an offer of proof regarding the testimony of excluded witnesses Peter Pollard and Austin Arterburn. The record affirmatively refutes this claim. The record establishes that trial counsel did make an offer of proof with respect to both witnesses. Moss first called an investigator hired by the defense who interviewed Pollard in February 2016. The investigator testified as to what Pollard told him about what he observed on the night of May 14, 2015, into the morning of May 15. Moss also made an offer of proof by calling Arterburn to explain the testimony he would have given if he had been permitted to testify at trial. This claim therefore lacks merit.

### V. CONCLUSION

We conclude that the record on direct appeal is insufficient to address three of Moss' ineffective assistance of counsel claims. We otherwise find no merit to the remaining claims or the other assigned errors. As a result, we affirm his convictions and sentences.

AFFIRMED.